**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **RAYMOND L. SHERWOOD III**, **LAUREN R. SHERWOOD**, individually and on behalf of their minor children, **B.B.** and **H.B.**, and **SAVANNAH R. BECKNER**, | ) ) ) ) ) ) | |
| **Plaintiffs**, | ) ) | |
| v. | ) ) | **Civil Action No.** <u>7:25-cv-821</u> |
| **COUNTY OF BOTETOURT, VIRGINIA** a municipal corporation organized under the laws of the Commonwealth of Virginia, | ) ) ) ) | **AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF** |
| **BOTETOURT COUNTY SCHOOL BOARD**, a corporate body organized under Virginia law, | ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| **MARSHALL LUKACS**, in her individual capacity, | ) ) ) | |
| **JOHN R.H. ALEXANDER**, in his individual capacity, | ) ) ) | |
| **MATTHEW T. WARD**, in his individual capacity, | ) ) ) | |
| **KEVIN M. HIX**, in his individual capacity, | ) ) ) | |
| **WILLIAM G. BENTLEY**, in his individual capacity, | ) ) ) | |
| **KASEY L. THOMAS**, in her individual capacity, | ) ) ) | |
| **TIMOTHY A. MCCLUNG** in his individual capacity, | ) ) ) | |
| **Defendants**. | ) | |

## COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

This case concerns the collective failure of the individuals and institutions responsible for protecting Botetourt County's children and families—officers of the Sheriff's Office, prosecutors of the Commonwealth's Attorney's Office, the magistrate, jail personnel, and key decisionmakers within the School Board—who, acting without probable cause, wrongfully targeted Ray Sherwood, an innocent father and 100% service-connected disabled veteran with documented sensory and cognitive limitations, shattering his reputation and traumatizing his wife Lauren and their three young daughters. (Ex. VA Rating, Ex.V).

At the very moment sworn officers of the Botetourt County Sheriff's Office, acting under color of law, were publicly portraying Mr. Sherwood as some kind of a sexual threat, they did so even though they had no lawful basis and no sworn probable cause to support any charge.

Ray's name, his face, his dignity, and future were being digitally executed before he ever saw the inside of a courtroom. At that same moment, the Botetourt County School Board ratified Mr. Sherwood's termination as a school bus driver before his statutory appeal window closed, denying him any opportunity for a name-clearing hearing or even a meaningful chance to respond. In fact, Ray never got that opportunity to be heard without fear of state coercion threatening his life, liberty, and pursuit of happiness if he did so.

**Until now—before this Honorable Court.**

And this was not an isolated occurrence. As reflected in another civil action now pending before this Court, the same School Board has been accused of denying a different employee the ability to exercise her appeal rights during her protected window, reflecting a broader pattern in which the Board forecloses statutory review before it can occur. (Ex. __).

2

This emerging pattern reinforces that the deprivation of Mr. Sherwood's procedural protections was not a one-off administrative error but part of a recurring practice that predictably, and unlawfully, strips employees of their right to be heard.

Their actions led directly to Ray's summary termination from a job he loved, equally as much as the community that loved him doing it and that dearly miss him. (Ex.__).

These actions all of which culminated in officers exploiting the very service-connected sensory and cognitive injuries that made the County's deception more damaging and disorienting, not because Mr. Sherwood was incapable, but because those impairments amplified the harm of a tactic that even a non-disabled person might have fallen for. They lured him to the jail solely so they could capture a mugshot, a photograph of his face, for the purpose of publicly branding him a sexual threat *before he ever stepped foot inside a courtroom*.

And the officials responsible for initiating and sustaining the actions against Mr. Sherwood did all this **after the fact**—after the allegations failed to withstand even basic scrutiny—not because the Constitution required it, but because they acted rashly and then pressed forward rather than confront their mistake. In doing so, they branded an innocent man, a father, husband, neighbor, honorably discharged veteran, and former police officer, because that was easier than admitting they were wrong.

This digital public execution, a punishment ordinarily imposed only after a felony trial before a judge or jury, was inflicted on Mr. Sherwood based on twenty-five fabricated assault-and-battery charges that were unlawful, *void ab initio*, and never supported by a single sworn statement of probable cause.

This was not an accident.

It was done in deliberate defiance of the U.S. Constitution and the very laws these sworn officers took an oath to uphold.

This lawsuit is about accountability. It is about what happens when people in positions of power cut corners, ignore the law, and destroy a man's life because it is easier than admitting they were wrong. Leaving his wife, Lauren, and his stepdaughters, Savannah, B.B., and H.B., in the crosshairs of injustice, forced to bear witness as the man they love was unjustly degraded, and publicly shamed without any lawful basis or probable cause, all while they collectively endured stigma, social ostracism, and whispered suspicion born entirely of unlawful state action.

Their story is the human cost of a justice system that modernized its weapons and surveillance tools while leaving its constitutional safeguards decades behind. To understand how this could happen, one must look beyond the individual officers and examine the County's larger policy decisions, especially its heavy investment in policing technology and its simultaneous neglect of meaningful oversight or legal safeguards. (Ex. __).

This case reveals how modern law-enforcement technology purchased in the name of "public safety" and "officer protection" was weaponized by Botetourt County officials to circumvent constitutional safeguards and publicly punish Plaintiffs Raymond Sherwood and his family before any court ever found probable cause or guilt.

Rather than using new technology to make the justice system more accurate, transparent, or fair, Botetourt County used it to lure Mr. Sherwood into a warrantless, no–probable-cause arrest, to conceal which officers were responsible, and then conduct a digital public execution of his name, reputation, and ability to live with dignity as a father and human being.

And this tactic was not unique to Mr. Sherwood. Upon information and belief, Botetourt County has for years used its closed-loop communication channels, particularly deputy-to-

4

dispatch phone routing, to obscure which officers initiate these encounters and to create the later appearance that the targeted individual "came in voluntarily." By funneling initial contact and follow-up inquiries through dispatch rather than direct officer-to-citizen communication, the County's systems leave behind a sanitized record: calls to dispatch, a citizen's arrival at the jail, and no clear indication of who orchestrated the encounter.

Against that backdrop, the Friday-evening, familiarity-based "come down voluntarily" method has been used repeatedly; indeed, community accounts and public records reflect similar incidents dating back to the early 2000s. In many cases, including Mr. Sherwood's, the deputy making the call is someone the targeted individual personally knows: a former colleague, acquaintance, or familiar face who leverages that personal connection as part of the script. The deputy adopts an informal, conversational tone, presenting the contact as a courtesy rather than a custodial command, saying things to the effect of "hey, I saw your name on some papers," and implying they are doing the person a favor by giving them a private heads-up. The deputy then suggests it would "look better" if the person came down voluntarily, and often hints that this is preferable to being arrested at home in front of their spouse or children.

This calculated blend of a concealed communications trail, manufactured familiarity, and implied threat routinely induces individuals to appear at the jail of their own accord—only for the façade to drop the moment they walk through the door, when they are processed, booked, and converted from citizen to defendant.

The Sherwood's are not an isolated accident; their experience is the predictable outcome of a broader pattern in which rural counties invest heavily in enforcement technology while withholding resources from the "justice side" of the system, such as legal aid, oversight, and access to counsel, especially for low-income and marginalized residents. (Ex. _, Ex. _, Ex. _).

Mr. Sherwood's ordeal was not the product of a misunderstanding. It was the product of power wielded through technology.

Rather than use modern tools to make the justice system more accurate or transparent, Botetourt County used its new communications infrastructure to lure Mr. Sherwood into a warrantless, no probable-cause arrest, obscure which officers were responsible, and then convert his mugshot into a digital public execution of his name, reputation, and ability to live as a father (Ex. __).

**Technology became the method, the concealment, and the punishment.**

At the same time that deputies misused County-funded dispatch and radio systems to ensnare him, County officials were publicly celebrating more than $24 million in new law-enforcement technology, including encrypted radios, hardened towers, ALPR surveillance, and a new E-911 center.

Sheriff Matthew Ward explained the County's decision to fully encrypt its radio system as follows:

> **Encryption is the direction agencies are moving towards for officer safety in the current environment and today's law enforcement world. It is unfortunate that those who are innocent and with good intentions are excluded from this transition however officer safety must come first.**

*Emergency Communications System Update Presentation*, Botetourt County Emergency Communications Project, at 5 (statement of Sheriff Matthew Ward, Mar. 26, 2024) (Ex. __).

Sheriff Ward's statement is not about radio encryption at all. It is about a philosophy of policing that accepts the exclusion of innocent residents from transparency in order to expand state power. When a Sheriff openly acknowledges that "those who are innocent and with good intentions are excluded" from the County's new communication system, and does so without establishing any alternative safeguards, the resulting environment is one in which warrantless

6

arrests, concealed officer conduct, and digital punishment are not aberrations—they are foreseeable outcomes. Mr. Sherwood's case proves exactly that.

These expenditures made law enforcement more powerful, more insulated, and less accountable than ever before.

But, no similar modernization occurred on the rights-protective side of the system.

Botetourt remains part of what Virginia bar leaders have called a "legal desert," a region with chronic attorney shortages, minimal legal-aid capacity, and some of the worst access-to-justice conditions in the Commonwealth. (Ex. __). Only a fraction of low-income residents facing serious legal problems ever obtain a lawyer. Rural counties like Botetourt, jail people at some of the highest per-capita rates in Virginia, despite lower crime, while Black and poor residents bear a disproportionate share of arrests, incarceration, and victimization. (Ex. __). In this environment, misuse of technology carries heightened and foreseeable risk of unchecked abuse.

The Sherwood matter exemplifies what happens when a modernized enforcement apparatus collides with an unmodernized justice system. Deputies used encrypted channels and dispatch systems to lure Mr. Sherwood into custody without probable cause; jail intake technology to capture a mugshot whose primary purpose was public shaming, not lawful detention; and social-media platforms to brand him to the world before he ever stepped foot inside a courtroom. Meanwhile, no digital safeguards existed to ensure probable cause was ever documented, filed, or reviewed.

In short, Botetourt County chose to modernize the tools it uses against its residents while leaving unmodernized, and in many ways underdeveloped, the tools its residents need to defend themselves. **In doing so, it treated Mr. Sherwood as a class of one**: a rural citizen subjected to

7

the most sophisticated enforcement technology the County has ever possessed, yet denied the procedural safeguards, oversight, and access to justice that more resourced regions of Virginia take for granted.

The result was not only a wrongful arrest. It was state-engineered digital punishment imposed without probable cause, without a fair trial, and without any meaningful avenue for redress until this lawsuit.

**Ray Sherwood deserves his name back.  And the truth deserves to be told**.

Plaintiffs Raymond L. Sherwood III ("Mr. Sherwood") and Lauren R. Sherwood ("Mrs. Sherwood"), together with their daughters Savannah R. Beckner, B.M.B., and H.M.B., by and through undersigned counsel Jon C. Clark, Esq., bring this civil-rights action under 42 U.S.C. § 1983, 20 U.S.C. § 1681 (Title IX), and related state-law claims pursuant to 28 U.S.C. § 1367.

This civil-rights action arises from a coordinated misuse of state power among multiple Botetourt County agencies, including the Commonwealth's Attorney's Office, the Sheriff's Office, and the School Board. Their actions destroyed the reputation and livelihood of Raymond L. Sherwood III— a decorated, disabled veteran who retired after more than twenty years of honorable service, ten of which he spent in the Reserves while also serving as a police officer in Prince William County, Virginia.

Following his military retirement, Mr. Sherwood relocated to Roanoke, Virginia, where he worked as an investigator with the Drug Enforcement Administration. There he met his wife, Lauren Sherwood, and together they built a life in Botetourt County with her three daughters.

8

True to his nature, Mr. Sherwood continued to serve his community after leaving federal service, working as a school-bus driver for Botetourt County Public Schools and remaining the kind of steady public employee every parent hopes will drive their children safely home.

However, on May 2, 2025, the defendants, acting under color of law, disregarded the most basic safeguards of the Fourth and Fourteenth Amendments. They obtained and executed twenty-five misdemeanor warrants without any sworn affidavit, oath, or recorded statement of probable cause, rendering each charge *void ab initio* and unlawful under Virginia law and the United States Constitution. On that invalid foundation, the defendants set in motion a chain of events that led to Mr. Sherwood's arrest, public humiliation, and termination from his employment with Botetourt County Public Schools, all before any independent review of the facts or opportunity to clear his name.

Surveillance footage later confirmed that no criminal conduct ever occurred, and the Commonwealth ultimately dismissed or deferred every charge.

**Mr. Sherwood was, and remains, an innocent man.** Yet the stigma of those unfounded accusations and official statements continues to shadow him and his family. Through this action, the Sherwood family seeks redress for the violations of their constitutional rights under 42 U.S.C. § 1983, Title IX, and Virginia law, and asks this Court to reaffirm that in the Commonwealth of Virginia, no citizen should lose his freedom, his good name, or his livelihood without lawful cause.

9

## I. JURISDICTION AND VENUE

1.  This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983 and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.

2.  This Court is authorized to award declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–2202, *Ex parte Young*, 209 U.S. 123 (1908), and Federal Rules of Civil Procedure 57 and 65.

3.  The Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367 because those claims form part of the same case or controversy under Article III of the United States Constitution.

4.  This action asserts claims against Defendants Marshall Lukacs and John Alexander solely in their individual capacities for actions taken under color of state law that exceeded the bounds of their lawful prosecutorial authority. No claims are brought against the Commonwealth of Virginia, any state agency, or any defendant in an official capacity. Accordingly, this action does not implicate Eleventh Amendment sovereign immunity. See *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989); *Hafer v. Melo*, 502 U.S. 21 (1991).

5.  Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and Local Civil Rule 2(b) because a substantial part of the events or omissions giving rise to these claims occurred in Botetourt County, within the Roanoke Division.

6.  Personal jurisdiction is proper because all Defendants reside in, conduct substantial business in, or committed the acts and omissions giving rise to this action within the Western District of Virginia.

## II. PARTIES

7.      **Plaintiff Raymond L. Sherwood III ("Mr. Sherwood")** is a resident of Botetourt County, Virginia, and at all relevant times, was employed by Botetourt County Public Schools as a school-bus driver.

8.      **Plaintiff Lauren R. Sherwood ("Mrs. Sherwood")** is a resident of Botetourt County, Virginia, and the wife of Mr. Sherwood. She is also the mother of Plaintiffs Savannah R. Beckner, B.M.B., and H.M.B.

9.      **Plaintiff Savannah R. Beckner** is the adult daughter of Plaintiff Lauren R. Sherwood and the stepdaughter of Plaintiff Raymond L. Sherwood III. She resides in Botetourt County, Virginia, and was a senior at Lord Botetourt High School when the events giving rise to this action occurred.

10.     **Plaintiff B.M.B**. is a minor child who resides with her mother, Plaintiff Lauren R. Sherwood, in Botetourt County, Virginia. She is the stepdaughter of Plaintiff Raymond L. Sherwood III. She brings her claims in this action through her mother and next friend, Lauren R. Sherwood. She is currently a student within the Botetourt County Public School system.

11.     **Plaintiff H.M.B**. is a minor child who resides with her mother, Plaintiff Lauren R. Sherwood, in Botetourt County, Virginia. She is the stepdaughter of Plaintiff Raymond L. Sherwood III. She brings her claims in this action through her mother and next friend, Lauren R. Sherwood. She is currently a student within the Botetourt County Public School system.

12.     **Defendant County of Botetourt, Virginia ("the County")** is a municipal corporation organized under the laws of the Commonwealth of Virginia and capable of being sued in its own name.

11

13.     **Defendant Botetourt County School Board ("the School Board")** is a local governmental body and corporate entity organized under Virginia Code § 22.1-71 *et seq.* It exercises final policymaking authority over employment, personnel, and grievance matters for Botetourt County Public Schools.

14.     **Defendant Matthew T. Ward ("Ward")** is the Sheriff of Botetourt County and is sued in his individual capacity only for actions taken under color of state law. He is also sued in his official capacity solely for purposes of Plaintiffs' claims under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, including for declaratory and injunctive relief.

15.     **Defendant Kevin M. Hix ("Hix")** is a Lieutenant with the Botetourt County Sheriff's Office and is sued in his individual capacity only for actions taken under color of state law.

16.     **Defendant William G. Bentley ("Bentley")** is a Sergeant and Public Information Officer with the Botetourt County Sheriff's Office and is sued in his individual capacity only for actions taken under color of state law.

17.     **Defendant John R.H. Alexander ("Alexander")** is the Commonwealth's Attorney for Botetourt County and is sued in his individual capacity only for investigative and extrajudicial acts undertaken under color of state law.

18.     **Defendant Marshall Lukacs ("Lukacs")** is an Assistant Commonwealth's Attorney for Botetourt County and is sued in her individual capacity only for investigative and extrajudicial acts undertaken under color of state law.

19.     **Defendant Timothy A. McClung ("McClung")** is the Director of Human Resources and Title IX Coordinator for Botetourt County Public Schools and is sued in his

individual capacity only.

20.    **Defendant Kasey L. Thomas ("Thomas")** is a resident of Virginia and, at all relevant times, was employed by the Virginia Department of Corrections as a probation officer assigned to Botetourt County. She is sued in her individual capacity for conduct giving rise to Plaintiffs' state-law claims, including defamation, civil conspiracy under Virginia Code §§ 18.2-499 and 18.2-500, and related torts. Plaintiffs do not assert any claim against Thomas under 42 U.S.C. § 1983. Thomas's actions, undertaken while acting under color of her state position and in coordination with other defendants, constitute individual tortious conduct for which she is personally liable under Virginia law.

### III. FACTUAL BACKGROUND

21. On or about April 17, 2025, Probation Officer Kasey L. Thomas reported to school officials that Plaintiff, school-bus driver Raymond L. Sherwood III, had "inappropriately touched" her daughter, K.J.D., while operating his bus. From the outset, the allegation was inconsistent with basic facts. Upon information and belief, K.J.D. was not assigned to Mr. Sherwood's route and voluntarily boarded his bus each morning despite having multiple alternative routes and drivers available. While voluntary interaction does not categorically rule out misconduct in every circumstance, it is one of several objective facts that rendered the allegation implausible.

22. According to accounts relayed during the initial investigation, Thomas claimed she overheard her daughter on the evening of April 16 making casual remarks to a friend about alleged touching by Mr. Sherwood. Thomas did not treat the situation as urgent. She simply told her daughter to report any further incident. Her initial response reflected a belief that nothing criminal or dangerous had occurred at that time.

23. The timeline further reinforces this inference. Thomas allegedly overheard remarks on April 16 concerning an incident she believed occurred on April 15. Yet she sent her daughter onto Mr. Sherwood's bus the following morning—*before* making any report and without implementing any protective measures. A parent who genuinely believed misconduct had occurred the day before would not return her child to the same driver the very next morning. This sequence strongly indicates that Thomas did not personally believe any criminal conduct had occurred on April 15.

24. The arrest warrants later issued in this case list alleged offense dates of April 15 and April 22, 2025 (Ex. D). If Thomas overheard remarks on April 16 but did not report anything

14

until April 17, then the April 22 allegation necessarily arose after her initial report, and yet K.J.D. continued voluntarily boarding Mr. Sherwood's bus during this same period. The student's continued voluntary use of Mr. Sherwood's bus both before and after the report is fundamentally inconsistent with any belief by her, her mother, or school administrators that he posed an actual danger.

25.     The school system's own actions during this period further underscore the implausibility of the allegations and the absence of any perceived danger. From April 17 through April 23, Mr. Sherwood continued driving his regular bus route without restriction, unaware that any report had been made, while K.J.D. continued voluntarily boarding his bus each morning. If school officials or Thomas genuinely believed a risk existed, they would not have permitted this continued daily contact. Even more telling, after Mr. Sherwood was abruptly suspended by telephone on the evening of April 23, Botetourt County Public Schools nevertheless allowed him to chaperone the high school prom on April 26, placing him in direct supervisory contact with hundreds of students. It is irreconcilable that a school-bus driver allegedly posing an immediate risk to students would be barred from driving a bus on April 23 yet authorized to supervise minors at a major school event two days later. This sequence demonstrates that, at the time, neither the school nor Thomas actually viewed Mr. Sherwood as a threat.

26.     Upon information and belief, Thomas is a former Roanoke City Police Officer and, at all relevant times, was serving as a probation officer with close family connections inside the Botetourt County Sheriff's Office and close professional working relationships with the Botetourt County Commonwealth's Attorney's Office. These relationships gave her accusation disproportionate institutional weight, leading Sheriff's Office personnel to treat her report as presumptively credible despite the absence of corroboration and the timeline inconsistencies

15

outlined above (Ex. LL).

27.    Although Thomas initially reported her concern to school personnel, including Dr. Lisa Taylor, the Principal at James River High School, the school did not initiate any formal Title IX process, did not interview Mr. Sherwood, did not provide him written notice of allegations, and did not implement any supportive or protective measures as required by federal law and School Board policy JFHA. The student's continued voluntary use of Mr. Sherwood's bus further aligned with that assessment. Only after the school declined to escalate the matter internally did the report shift to law-enforcement channels, where Thomas's professional role and connections appear to have contributed to an unusually aggressive criminal response, one ultimately unsupported by probable cause and resulting in no conviction (Ex. U).

28.    At a later bond-amendment hearing, Assistant Commonwealth's Attorney Marshall Lukacs asserted that K.J.D. chose Mr. Sherwood's bus "because it was the quickest." Upon information and belief, all high-school routes passed through a central transfer hub where students freely selected among buses, making the "quickest bus" explanation impossible. The more plausible inference is that the student voluntarily boarded Mr. Sherwood's bus because she preferred to, not because of necessity.

29.    The report was referred to Lieutenant Kevin M. Hix of the Botetourt County Sheriff's Office, who initiated an investigation that, upon information and belief, presumed Mr. Sherwood's guilt rather than testing the credibility of the claim or the plausibility of the timeline.

30.    The situation soon expanded to include a second student, W.M.R., who was K.J.D.'s closest friend and the same individual on the April 16 call Thomas allegedly overheard. Despite the close friendship and identical circumstances, W.M.R.'s statement merely echoed K.J.D.'s account and contained no allegation of sexual contact, coercion, threat, or improper

16

intent, yet it became the basis for additional charges.

31.    Upon information and belief, surveillance footage reviewed that week showed no criminal conduct, no intimate touching, and no behavior suggesting sexual intent. Despite this, the investigation escalated rather than ended.

32.    The contacts consisted only of brief, incidental, or supervisory gestures typical of a school-bus driver assisting students, all occurring openly, in view of multiple students, and directly before the surveillance cameras that recorded every moment, circumstances fundamentally inconsistent with any criminal intent.   Nevertheless, acting directly on A.C.A. Lukacs's instruction to "bring a charge for each contact made," Lt. Hix proceeded to obtain twenty-five misdemeanor warrants, none supported by a sworn affidavit or recorded probable-cause statement (Exs. V, Y). These facially invalid warrants violated Va. Code § 19.2-72 and were void ab initio because no neutral magistrate ever determined that probable cause existed.

33.    Rather than issue a summons as expressly permitted under Va. Code § 19.2-74 for Class 1 misdemeanors involving non-injurious, non-violent conduct, Lt. Hix elected to conduct a full custodial arrest. The alleged "assault and battery" consisted of only incidental, non-injurious contact, making a summons the appropriate statutory mechanism. Hix's decision served no legitimate law-enforcement purpose and had the foreseeable effect of ensuring that Mr. Sherwood's mugshot and charges would be publicly disseminated. Although styled as "assault and battery," the underlying conduct was non-injurious and therefore should have been treated as non-violent and summons-eligible under Va. Code § 19.2-74, which mandates issuance of a summons for misdemeanors absent the statutory exceptions. See *Virginia v. Moore*, 553 U.S. 164, 168–69 (2008).

34.     Issuance of a summons should have occurred here. After learning of the allegations, Mr. Sherwood immediately attempted, multiple times, to contact Lt. Hix, but Hix did not return his calls. When Hix finally responded, he quickly arranged a one-on-one recorded interview, to which Mr. Sherwood voluntarily agreed. A decorated, disabled veteran who served more than twenty years in the military and over a decade as a police officer and federal agent, Mr. Sherwood had nothing to hide. He met Lt. Hix at the local Veterans of Foreign Wars chapter, a location Hix himself chose because it was close to Mr. Sherwood's home and reflected Hix's awareness of Mr. Sherwood's longstanding ties to the community. Despite Mr. Sherwood's full and voluntary cooperation, his deep roots in the area, and the absence of any flight risk or danger, Lt. Hix nevertheless pursued a custodial arrest rather than issue a summons as required under Va. Code § 19.2-74, arresting a man with no criminal record and not even a single disciplinary write-up in his employment history with Botetourt County Public Schools.

35.     On May 6, 2025, the Sheriff's Office issued a press release identifying Mr. Sherwood and announcing he had been charged with twenty-five counts arising from alleged misconduct involving a school-bus driver (Ex. E). Although the release included a sentence stating that the touching "did not involve intimate areas," its framing, highlighting an "assault investigation," "alleged misconduct," coordination with school officials, and solicitation of additional witnesses, conveyed the false impression of sexual wrongdoing. The release omitted that no sworn probable-cause statement existed.

36.     The next day, on May 7, 2025, the Sheriff's Office made public comments to WSET stating that the alleged assaults involved "more than one student" and rejecting community explanations that the alleged conduct consisted of "hugs and high fives" (Ex. F). These statements, issued while knowing that no intimate touching had been alleged, further

18

cemented the false impression that Mr. Sherwood had engaged in sexually improper conduct.

37. Later that same day, and relying on these public statements, the Botetourt County School Board terminated Mr. Sherwood within his ten-day appeal window, without giving him any opportunity to respond, without disclosing the allegations, and without providing any name-clearing hearing (Exs. A–C).

38. At the time, the Division Superintendent of Botetourt County Public Schools was Dr. Jonathan Russ. Under Va. Code § 22.1-315, only the superintendent may recommend termination of a school employee. No such recommendation was issued. Instead, Human Resources Director Timothy McClung, who lacked statutory authority, issued his own recommendation, and the Board adopted it on May 8. The Board's action was ultra vires, void under Virginia law, and deprived Mr. Sherwood of procedural due process.

39. Newly uncovered evidence demonstrates that the Botetourt County School Board and key administrators, including Director of Human Resources and Title IX Coordinator Timothy A. McClung, engaged in a series of concealed, procedurally irregular, and unlawfully adopted policy revisions between April 4 and April 11, 2025, immediately preceding the allegations against Mr. Sherwood and directly coinciding with the events that resulted in his suspension and termination. These concealed actions, combined with the School Board's role in approving the Sheriff's Office press release, support a reasonable inference that the School Board played a significant role in shaping and exploiting the narrative that followed.

40. The publicly posted agenda for the School Board's April 10, 2025 meeting contained no notice whatsoever of any new policy adoptions, revisions, or regulatory changes. The consent agenda referenced only "VSBA February 2025 Policy Updates," without identifying the policies being voted on or alerting the public that any employee-related or transportation

19

related policies were under consideration. No individual policy code, including GBLA, GDQ, JFCC, JFCC-R, or JFCC-BR1, was publicly listed (Ex. SB-Agenda).

41.    Despite this lack of public notice, BoardDocs metadata shows that twenty-two new or materially revised School Board policies were uploaded on April 11, 2025, the day after the meeting. These files included major revisions governing third-party complaints against employees, student conduct on school buses, bus-stop procedures, transportation oversight, staff hiring, and investigative responsibilities, policies directly relevant to the allegations later weaponized against Mr. Sherwood.

42.    Among these irregular uploads was a newly issued GBLA (Third-Party Complaints Against Employees) policy, which first appeared online on April 11, 2025, despite showing an internal "revision date" of April 10 and despite no record of the School Board ever presenting, reading, or voting on GBLA during the April 10 meeting (Ex. SB-GBLA).

43.    GBLA is particularly significant because it establishes the procedures by which outside individuals, including parents and law-enforcement personnel, may file complaints alleging employee misconduct. The policy includes confidentiality requirements, investigation timelines, and prohibitions on improper disclosure. None of these procedures were followed in Mr. Sherwood's case.

44.    GBLA was not only concealed from the April 10 agenda, it was buried inside a large omnibus PDF labeled "Final Policies as One Document," which contained dozens of policies and gave no indication that GBLA was newly created or substantively revised. The PDF's filename misleadingly suggested mere consolidation of existing policies, masking the insertion of new rules (Ex. SB-FinalPolicies).

45.     These concealed policies were adopted in violation of School Board Policy BFC (Policy Adoption), which requires policies to be presented openly, with first and second readings, and with sufficient public notice to ensure meaningful participation (Ex. SB-BFC). BCPS did not comply with any of these requirements.

46.     Also uploaded on April 11 were new or revised bus-related policies, including GDQ (School Bus Drivers), JFCC (Student Conduct on School Buses), JFCC-R (Guidelines to Adding a Bus Stop), and JFCC-BR1 (Elementary Bus Stops), each showing an April 10 revision date but no public discussion, presentation, or vote (Ex. SB-BusPolicies). These transportation-related policies regulate bus-driver conduct, student-interaction protocols, camera-footage handling, and routes.

47.     The sudden and concealed adoption of these transportation policies one week before the allegations suggests that the School Board was preparing or modifying the regulatory framework that would later be invoked against Mr. Sherwood. The timing of these uploads is not coincidental. Between April 4 and April 11, multiple transportation-related documents, including policy revisions and forms for bus-management procedures, were created or modified, then uploaded on April 10–11, precisely the period leading up to the alleged April 15 and April 22 incidents and one week before Mr. Sherwood was informed of any allegations (Ex. SB-MetadataSummary).

48.     The School Board's actions during this period also coincided with significant budget and staffing pressures, including transportation-department deficits documented in the School Board's FY26 proposed budget. That budget, approved on April 9, 2025, highlighted the need to reduce costs, consolidate transportation routes, and reevaluate staffing assignments (Ex. SB-FY26Budget). Removing a popular but protected, 100 percent disabled veteran driver would

have provided budgetary relief that the School Board appeared increasingly motivated to achieve.

49.     That Mr. Sherwood was widely beloved in the community is confirmed by hundreds of public comments responding to the Sheriff's May 6 press release. Parents, students, and colleagues overwhelmingly expressed shock, disbelief, and support for Mr. Sherwood, praising his professionalism, kindness, and integrity (Ex. SB-PressComments). This public reputation made termination politically dangerous for the School Board unless it could be framed as necessary for safety.

50.     The School Board's internal actions mirror that political calculus. Rather than conduct a Title IX investigation, mandatory under federal law and School Board policy JFHA/GBA, McClung, who was personally trained on Title IX investigative duties, failed to provide Mr. Sherwood with written notice of allegations, failed to initiate any formal Title IX process, failed to implement supportive measures, and failed to conduct an investigation (Ex. SB-TitleIXTraining; Ex. SB-JFHA).

51.     Instead, McClung made inconsistent and shifting statements to Mr. Sherwood about the nature of the allegations, including initially saying that Mr. Sherwood "talked to girls more than boys" and that "unprofessionalism" was the basis for discipline, statements contradicted by the Sheriff's later press release alleging inappropriate touching. These contradictions support an inference of pretext.

52.     Internal communications reveal that BCPS notified Mr. Sherwood of his suspension by telephone on April 23, 2025, without providing any written notice of allegations or procedural rights, despite knowing that such practices violated Board policy and denied Mr. Sherwood due process. He was then banned from campus, except when selectively permitted by

22

McClung for his children's events, further demonstrating the arbitrary nature of the School Board's actions (Ex. SB-CampusBanEmails).

53.     The School Board's decision to terminate Mr. Sherwood for "unprofessionalism" on May 2, 2025, six days before the Board met to ratify the termination on May 8, confirms the absence of lawful process. The May 2 recommendation letter was *ultra vires* because only the Superintendent may recommend termination under Va. Code § 22.1-315. McClung lacked the authority he exercised (Ex. A; Ex. B).

54.     Although McClung lacked statutory authority to terminate a School Board employee, he nonetheless issued Mr. Sherwood a written "Recommendation for Termination" stating that Sherwood's employment "be terminated effective May 2, 2025," thereby representing the termination as already effectuated rather than a mere recommendation awaiting School Board action. McClung further directed that, during any grievance, Mr. Sherwood "should not be on School Board property or communicating with School Board employees except for purposes directly related to the grievance process." By communicating the termination as final and unilaterally imposing a ban from School Board property, McClung acted outside his lawful authority and in violation of School Board policy, which vests termination and grievance-rights administration exclusively in the Superintendent and the School Board.

55.     The May 8, 2025 School Board meeting ratifying Mr. Sherwood's termination occurred while the Sheriff's Office was escalating the narrative publicly through the May 6 press release and May 7 WSET interview, which Major Boone later confirmed had been "approved" by the School Board. This sequence spans April 10–11 concealed policy changes, April 9 approval of the FY26 budget cuts, and May 6–8 coordinated termination and stigmatization.

56.     The Board's actions in this period demonstrate a clear pattern: concealing or

irregularly adopting policies relevant to employee discipline and transportation oversight; failing to follow mandatory Title IX and grievance processes; relying on pretextual grounds for termination; approving or acquiescing in stigmatizing public statements; and coordinating with law-enforcement actors during Mr. Sherwood's appeal window.

57.     In later communications with the press, however, Botetourt County Public Schools represented that Mr. Sherwood's employment was "terminated" effective June 30, 2025, which is both the last day of the school division's fiscal year and the end of the 2024–2025 transportation contract period. On paper, therefore, BCPS continued to carry Mr. Sherwood as an employee through June 30 while, in practice, treating him as fired as of May 2, banning him from school property, and cutting off his access to the workplace and grievance procedures. This internal inconsistency supports a reasonable inference that the School Board and its administrators kept Mr. Sherwood on the books only through the fiscal year to avoid budgetary and payroll consequences, while simultaneously depriving him of pay, benefits, and meaningful due-process protections. (Ex. FF).

58.     Because the School Board never clearly processed a formal termination in accordance with its own policies, Mr. Sherwood and his family never received any COBRA election notice or other paperwork advising them of a right to continue their health-insurance coverage following his removal from duty. His hourly pay stopped in early May 2025, and he was treated in every practical respect as fired, but neither the School Board nor its benefits administrator ever provided written notice of a qualifying event or any opportunity to elect continuation coverage. As a result, Mr. Sherwood and his family lost access to his employer-sponsored health that they would not have incurred had the School Board handled his employment status lawfully.

24

59.     The failure to issue any COBRA notice is consistent with the School Board's strategy of keeping Mr. Sherwood listed as an employee through June 30, 2025 for its own administrative and budget purposes while simultaneously treating him as terminated for every other purpose, including pay, access to campus, reputation in the community, and his family's health coverage. That dual treatment further underscores the arbitrary and pretextual nature of the School Board's actions.

60.     The totality of these circumstances, including concealed policy adoption, metadata anomalies, post-meeting uploads, Title IX violations, inconsistent explanations, budgetary motives, and coordinated termination-press-release timing, supports a plausible inference that the School Board anticipated, facilitated, or willfully exploited the allegations against Mr. Sherwood for reasons unrelated to student safety.

61.     The Commonwealth eventually dismissed twenty-three of the twenty-five charges by nolle prosequi and entered deferred dismissals on the remaining two, without any plea, admission, or factual finding (Ex. U). These dispositions confirm that probable cause never existed for any charge.

62.     Mr. Sherwood accepted the Commonwealth's offer not because he was guilty, but because the Sheriff's Office's public accusations had rendered him unemployable. Every prospective employer either declined to consider him or stopped responding after searching his name. The deferral with no conviction, no admission, and no factual finding was the only realistic means of halting ongoing harm and stabilizing his ability to support his family.

63.     Even after the court accepted the agreement on October 14, 2025, the damage continued. On October 29, 2025, Botetourt County Commonwealth's Attorney John Alexander made public comments to The Roanoke Times and WDBJ7 describing "touching that verged on

25

inappropriate," followed by the statement that "there was no evidence to support charges of sexual assault," and later noting that "another factor taken into account was that Sherwood is no longer working as a school bus driver." Read together, those statements have understandably been interpreted as suggesting sexual misconduct or moral unfitness (Exs. FF–GG). These statements, issued while knowing there had been no factual finding, no conviction, and no intimate touching, reinforced the defamatory implication that Mr. Sherwood was unfit to work with children and wrongly associated his name with sexual impropriety.

64.    After defense counsel sought clarification, Mr. Alexander received a written request on October 31, 2025, notifying him that his statements were misleading and harmful (Ex. R). He refused to retract them (Exs. HH–II).

65.    Between July and September 2025, defense counsel Joseph Cockfield repeatedly requested that the Commonwealth's Attorney's Office produce the affidavits supporting the twenty-five arrest warrants and other exculpatory or court-ordered materials (Ex. H). His requests on July 18, August 7, August 26, and September 15 specifically sought the sworn probable-cause affidavits, expert materials, the list of parents who viewed the bus video and reported no misconduct, the April 16–17 and 23 bus footage, and the list of children riding Bus 22 as ordered by the Court.

66.    Despite four separate follow-up emails, neither Marshall Lukacs nor John Alexander provided any of the requested probable-cause documentation or explained its absence. Their silence during this period further corroborates that no sworn probable-cause statement existed and that exculpatory information was withheld from the defense during the pendency of the prosecution. FOIA requests to Alexander and the Sheriff's Office in early November were denied as "ongoing," implying they possessed probable-cause materials, an implication later

26

disproven by the JDR Clerk and the Office of the Executive Secretary, who confirmed that no such statement was ever created (Exs. V, Y).

67.     On October 31, 2025, Plaintiffs served Notice of Claim upon the County and the Botetourt County School Board (Ex. W).

68.     On November 3, 2025, undersigned counsel received a certified, fully sealed JDR case file, which, when opened on video, revealed that multiple documents were missing, including any probable-cause affidavit, sworn statement, or oral-recording certification (Ex. AA). The Clerk later confirmed in writing that none existed in the file (Ex. V).

69.     On November 6, 2025, JDR Clerk Pamela Jarvis told undersigned counsel that the Court had not been receiving juvenile petitions or arrest warrants from the magistrate or the Sheriff's Office, confirming, per the recorded call, that no probable-cause documentation existed in Mr. Sherwood's file (Exs. DD–EE).

70.     On November 7, 2025, a re-certified file produced by the Clerk suddenly included a PowerSchool "Student Disciplinary Record" dated for the 2025–2026 school year that was absent from the sealed file opened and videotaped on November 3 and not referenced in counsel's November 3–5 correspondence (Ex. AA; Ex. Z).

71.     On November 13, 2025, the Office of the Executive Secretary of the Supreme Court of Virginia confirmed in writing that no sworn probable-cause affidavit, complaint, or recorded statement was ever created for any of the twenty-five warrants. Staff Attorney Jamie E. Meletis stated the warrants were "not accompanied by any probable-cause documentation" and referenced the Magistrate Manual's oath-or-affirmation requirement under Va. Code § 19.2-72 (Ex. Y). This confirmation corroborates the JDR Clerk's statements and shows the warrants lacked the jurisdictional prerequisites required by Virginia law.

27

72.     The sequence of events described above, including an implausible accusation by a law-enforcement insider, an investigation driven by prosecutorial instruction rather than evidence, unlawful issuance of warrants lacking any sworn basis, stigmatizing state-sanctioned defamation, an *ultra vires* termination, and the later appearance of documents in a judicial file, reveals a systemic breakdown of constitutional safeguards.

73.     Independent economic analysis prepared by economist Prabhat "Prab" Multani, M.A., dated November 13, 2025, confirms that the unlawful actions of Defendants caused Mr. Sherwood substantial and ongoing economic losses including lost wages, lost future earning capacity, impairment of retirement benefits, and long-term reputational harm that will materially diminish his lifetime earning potential (Ex. KK). These findings corroborate the severity and permanence of the financial consequences inflicted on the Sherwood family.

74.     On May 7, 2025, between approximately 3:00 and 4:00 p.m., Plaintiff Lauren Sherwood spoke by phone with Major Jeffrey Boone of Sheriff Ward's command staff. Seeking to understand why the Sheriff's Office issued a public press release about her husband, an action she understood to be unusual, Mrs. Sherwood was told by Major Boone that the May 6, 2025 press release had been "approved" by the Sheriff's Office, the Commonwealth's Attorney's Office, and the Botetourt County School Board. Major Boone subsequently confirmed this conversation in his written FOIA response, acknowledging that he returned Mrs. Sherwood's call at 3:32 p.m. on May 7, 2025 and that the call lasted 18 minutes, thereby corroborating the timing and occurrence of the exchange (Ex. ___).

75.     The circumstances of Mr. Sherwood's May 2, 2025 booking further illustrate how Botetourt County and the Sheriff's Office used technology and the County-owned dispatch system to orchestrate a warrantless, no-probable-cause arrest while making it appear "voluntary."

28

That afternoon, at approximately 4:46 p.m., Lieutenant Hix called Mr. Sherwood from the Sheriff's Office non-emergency number, (540) 473-8631. Mr. Sherwood did not answer and the call went to voicemail. In the message, Hix identified himself as a lieutenant with the Botetourt County Sheriff's Office and said he had been trying to reach Mr. Sherwood. Mr. Sherwood preserved that voicemail and later forwarded it to undersigned counsel, who screen-recorded the process of receiving the texted voicemail and emailing it to himself in order to preserve a clear chain of custody. (New Exhibit: Hix Voicemail Transcript and Screen-Recording Chain of Custody.)

76. At approximately 5:37 p.m. that same day, Lieutenant Travis Alderman called Mr. Sherwood from the same non-emergency line after the call was routed through the County's Emergency Communications Center. Alderman told Mr. Sherwood that he had "seen [Mr. Sherwood's] name on some papers" and that it would "look better" if Mr. Sherwood came to the jail and turned himself in so that he would not be arrested in front of his wife and young children. Although Alderman's precise role in the underlying charging decision remains unclear, the tenor and structure of the call matched the long-standing Sheriff's Office practice—documented in community accounts and public records dating back decades—in which a familiar or trusted deputy delivers a seemingly informal, conversational "heads-up" to induce the targeted individual to appear at the jail voluntarily. Alderman did not advise that a summons could be issued under Virginia Code § 19.2-74, did not state that any neutral magistrate had ever found probable cause, and did not suggest that Mr. Sherwood consult counsel or appear with his attorney. Relying on his own background in law enforcement and his belief that he had done nothing wrong, Mr. Sherwood complied and presented himself at the jail shortly thereafter.

77. County records and organizational charts show that the non-emergency number

Mr. Sherwood called and received calls from is part of a County-owned Emergency Communications system that is funded and administered by the County, with the Sheriff's Office listed only as a "user agency." Those documents also show that the system is designed so that calls from the public are first captured by County communications staff and then transferred to individual deputies. (New Exhibits: Emergency Communications Project Updates; County and BCSO Organizational Charts.)

78.    Upon information and belief, Botetourt County has for years permitted deputies to use this "closed-loop" arrangement—routing deputy-initiated calls through the Emergency Communications Center—to obscure which deputy initiated the encounter and to create the false later appearance that the citizen "came in voluntarily." In Mr. Sherwood's case, the use of the dispatch line, Alderman's familiarity-based "come down, it will look better" script, and the complete absence of any summons or on-scene arrest fit this pattern and reflect a County-level custom of using technology and informal scripts to lure individuals into custodial booking while avoiding contemporaneous scrutiny of probable cause. This custom foreseeably and repeatedly results in the same class of constitutional harms: the denial of citizens' rights to due process, the deprivation of equal protection through disparate and opaque methods of administration, and the erosion of basic human dignity when individuals are induced into custodial environments under false pretenses and without the protections that accompany a lawful arrest. As applied to Mr. Sherwood, these practices functioned exactly as designed—shielding the County's actions from oversight, evading judicial review of probable cause, and placing a disabled veteran directly into a high-risk jail environment without the procedural or ADA safeguards the Constitution and federal law require.

79.     Relying on his law-enforcement background and his belief that he had done nothing wrong, Mr. Sherwood complied and presented himself at the Botetourt County Jail shortly after Alderman's call. He remained in custody for roughly three hours. During that time, jail staff escorted him through secure, non-public areas of the facility, required him to surrender his personal property, subjected him to fingerprinting and a booking photograph, and held him under continuous supervision in a restricted area of the jail where he was not free to leave, all while waiting for an available deputy to serve him with the stack of twenty-five warrants (Ex. J-1).

80.     Mr. Sherwood observed that the warrants were served not by Hix, but by K-9 Deputy Kevin T. Smusz. While standing directly in front of Mr. Sherwood, Deputy Smusz wrote the same execution time on each of the twenty-five warrants. The time recorded on the warrants is inconsistent with Mr. Sherwood's call log and his account of when Alderman summoned him to the jail and when he arrived there, further illustrating the irregular manner in which the process was handled (Ex. D; Ex. J-1). Mr. Sherwood further observed that K-9 Deputy Kevin T. Smusz recorded the time of arrest as 5:03 p.m. on the warrants, a notation that was plainly incorrect. Mr. Sherwood recalled that the arrest occurred after 6:00 p.m., a timeline corroborated by the fact that Lt. Alderman did not even call him until 5:37 p.m. This discrepancy further demonstrates that the process was irregular and fabricated, particularly given that Mr. Sherwood—who requires ADA accommodations—was afforded none of the customary modifications to the arrest procedure. Compounding these irregularities, the arresting officers failed to document any identifying marks, including visible tattoos that would ordinarily be recorded during intake, underscoring that the standard booking process was not followed.

81.     In addition, upon arrival at the Botetourt County Jail, officers failed to implement any of the reasonable modifications required when interacting with an individual with known disabilities. Rather than conduct a standard field arrest—where probable-cause documentation must be shown, ADA obligations apply and where Mr. Sherwood could have been safely accommodated—the Sheriff's Office deliberately used a concealed dispatch transfer to lure him into the jail building, thereby engineering a custodial encounter in an environment inherently more dangerous for someone with his documented conditions. Once inside, jail personnel provided no accommodations whatsoever. Mr. Sherwood was denied the benefits of the public entity's services because no effort was made to adjust intake, booking, or custodial procedures to account for his disabilities. Officers also failed to conduct basic safety and identification steps, including screening, medical risk assessments, and documentation of identifying marks such as his tattoos. These omissions reflect discriminatory methods of administration in which internal procedures were weaponized to place a disabled veteran directly into a high-risk jail environment without safeguards, screening, or the modifications required to ensure equal access and safety (Ex. 100% rating).

82.     Only after Deputy Smusz finished writing on and serving all twenty-five warrants was Mr. Sherwood escorted to the magistrate's window. The magistrate had not personally taken sworn testimony or any oath-based statement from a complainant. As later confirmed by the Office of the Executive Secretary of the Supreme Court of Virginia, the warrants were "not accompanied by any probable-cause documentation" at all, meaning the magistrate proceeded without the affidavit or recorded statement required by Va. Code § 19.2-72 (Ex. Y, Ex. New one).

32

83.    The three-hour custodial booking was especially damaging because of Mr. Sherwood's service-connected disabilities. At the time of these events, the Department of Veterans Affairs had already recognized Mr. Sherwood as a significantly disabled veteran, and in September 2025 the VA issued a Rating Decision increasing his disability to 100 percent permanent and total, based in part on documented sensory and cognitive limitations and other conditions that were aggravated by the arrest, booking, and public shaming (Ex. DIS-1; Ex. DIS-2).

84.    A subsequent Virginia State Police public-records response regarding Central Criminal Records Exchange (CCRE) activity confirmed that, although VSP does not maintain a public "booking receipt," its Biometric Records Section manager verified that several fingerprint and CCRE submissions were received during the relevant timeframe for Mr. Sherwood (Ex. VSP-1). Multiple CCRE submissions for a single defendant during a single custodial event are highly unusual because standard Virginia criminal-processing procedures involve only one biometric submission unless there has been a rejection, misidentification, or other irregularity.

85.    The existence of several submissions therefore corroborates that Mr. Sherwood was fully processed as a criminal defendant more than once, even though the warrants were later admitted to have lacked any sworn probable-cause documentation. These biometric irregularities mirror the "dual anomaly" patterns visible in the Virginia J&DR Online System, where Mr. Sherwood's name and case numbers appeared in overlapping and inconsistent forms, as reflected in the public system screenshots (Ex. Online Sys.). Taken together, the unusual fingerprint activity and the irregular J&DR records reflect the same underlying problem: Botetourt County's record-handling practices created the appearance of a legitimate criminal case despite the absence of lawful procedural foundations.

33

86.     On December 4, 2025, public-records correspondence with Botetourt County Public Schools further revealed serious gaps and irregularities in how the School Board tracks and discloses student records in matters such as Mr. Sherwood's. In response to undersigned counsel's request for FERPA access and disclosure logs, BCPS FOIA Officer Jordan Pinkard stated that, under School Board Policy JO (Student Records), the division maintains no single, division-wide log of FERPA disclosures and that any such disclosure entries exist only in individual student files dispersed across the division (Ex. JO; Ex. FERPA 1). This admission reflects practices that conflict with FERPA's mandatory record-of-access requirement, 20 U.S.C. § 1232g(a)(4)(A) and 34 C.F.R. § 99.32(a)(1), which obligate educational institutions to maintain a complete and centralized record of every disclosure of personally identifiable student information. Because BCPS maintains no such system, there exists no centralized, auditable record reflecting when, why, or to whom BCPS disclosed the complaining students' records in connection with the investigation and prosecution of Mr. Sherwood, contrary to federal law and to Virginia's student-records regulations requiring reliable tracking of educational-record access.

87.     In a separate response concerning subpoena and subpoena duces tecum activity related to Mr. Sherwood's JDR Case No. JA009740/01-25, Mr. Pinkard confirmed that between September 25 and November 19, 2025, BCPS received two subpoenas duces tecum from the Botetourt County Commonwealth's Attorney's Office. The first subpoena, hand-delivered on October 1, 2025 and processed by Transportation Director Kris Clegg, resulted in the transmission of three documents. The second, hand-delivered on October 2, 2025 and processed by Amy Alphin, was fulfilled without any record of how many documents were transmitted in response (Ex. SDT-1).

34

88.     These admissions show that BCPS continued funneling student records into the prosecution months after Mr. Sherwood's termination while keeping incomplete metadata about what was sent, when it was sent, and by whom. The disclosure history further establishes that individual defendants John Alexander and Marshall Lukacs personally received school-division records that were never provided to Mr. Sherwood, despite repeated defense requests for the same information. Their actions in obtaining, reviewing, and retaining these records occurred outside any protected prosecutorial function and resulted in the suppression of material Brady and Giglio evidence that was required to be disclosed.

89.     School Board Clerk Susan Albert also responded to undersigned counsel's December 10, 2025 request for communications between BCPS and the Sheriff's Office by invoking Policy KBA and Regulation KBA-R, emphasizing that the division could assess search and duplication charges and might require advance payment of an estimated cost before proceeding (Ex. KBA; Ex. KBA-R; Ex. FOIA-1). Combined with the absence of centralized FERPA disclosure logs and the late insertion of a "Student Disciplinary Record" into the JDR file on November 7, 2025, these FOIA responses reinforce Plaintiffs' allegation that Defendants' record-keeping practices are structured in a way that obscures, rather than documents, how sensitive student and employee information was used to construct and sustain the narrative against Mr. Sherwood.

90.     The combined effect of the jail-lure and booking sequence, the lack of sworn probable-cause documentation, the VA's recognition of Mr. Sherwood's total 100% service-connected disabilities with documented sensory and cognitive limitations, the multiple fingerprint submissions confirmed by VSP, and the School Board's opaque handling of student-record disclosures all fit the same pattern. Rather than carefully following constitutional

and statutory safeguards, Defendants used their institutional power and control over records, technology, and procedure to publicly brand Mr. Sherwood as a sexual threat while leaving no reliable paper trail that would explain or justify how those decisions were made.

91.     These facts, together with the School Board's concealed policy changes and ultra vires termination, support Plaintiffs' claims under the Fourteenth Amendment, Title IX, the ADA and Section 504, and 42 U.S.C. § 1983, including Plaintiffs' Monell theories against both the School Board and the County. The County's long-standing coordination between its Emergency Communications Center and the Sheriff's Office, including the practice of routing deputy-initiated calls through the dispatch system to induce custodial appearances without probable cause, further demonstrates a County-level custom that foreseeably deprives individuals of due process, equal protection, and required ADA accommodations during the engineered custodial encounter.

92.     They also provide critical context for Plaintiffs' claims against Sheriff Ward, Lt. Hix, Sgt. Bentley, Commonwealth's Attorney Alexander, and A.C.A. Lukacs, who collectively orchestrated and maintained a prosecution that lacked the basic jurisdictional prerequisite of sworn probable cause while leveraging digital tools, press releases, and public records systems to maximize the reputational and emotional harm inflicted on Mr. Sherwood and his family.

93.     Plaintiffs therefore allege that Defendants' conduct was not an isolated mistake, but part of a broader pattern in which institutional actors at the School Board, Sheriff's Office, Commonwealth's Attorney's Office, and related agencies coordinated or acquiesced in a course of action that violated clearly established constitutional and statutory rights and devastated the Sherwood family.

## COUNT I
## MALICIOUS PROSECUTION / UNLAWFUL SEIZURE
## (AGAINST LAW ENFORCEMENT)
## 42 U.S.C. § 1983

(Against Defendants Kevin Hix and Matthew Ward, in their individual capacities)

### A. Incorporation of Allegations

1.      Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

### B. Factual Basis for Fourth Amendment Violation

2.      On May 2, 2025, Lt. Hix obtained twenty-five misdemeanor assault-and-battery warrants (Ex. D), none supported by a sworn affidavit or recorded oath as required by Va. Code § 19.2-72 and the Fourth Amendment. The JDR Clerk's certification confirms no probable-cause statement was ever filed (Ex. V).

3.      Between July and September 2025, defense counsel Joseph Cockfield repeatedly requested that the Commonwealth's Attorney's Office produce the sworn probable-cause affidavits for each of the twenty-five warrants, along with related exculpatory and court-ordered materials. (Ex. H). These four written inquiries sent July 18, August 7, August 26, and September 15, 2025 went entirely unanswered. Neither Marshall Lukacs nor John Alexander ever identified any sworn or recorded basis for the warrants, and their refusal to respond underscores that no such documentation existed.

4.      This absence was later confirmed by the Office of the Executive Secretary of the Supreme Court of Virginia, which stated in writing on November 13, 2025 that the warrants "were not accompanied by any probable-cause documentation." (Ex. Y). The unanswered defense requests and subsequent administrative confirmation demonstrate that each warrant was

37

issued without the mandatory oath or affirmation required by Va. Code § 19.2-72 and the Fourth Amendment.

5.      Absent an oath or affirmation, each warrant was *void ab initio* under both state and federal law. *Franks v. Delaware*, 438 U.S. 154, 165 (1978) (requiring truthful showing of probable cause); *Whiteley v. Warden*, 401 U.S. 560 (1971) (illegal warrant renders arrest unconstitutional).

6.      Hix knew the bus surveillance footage showed benign contact, not "rude, insolent, or angry" touching as required by Va. Code § 18.2-57. No reasonable officer could find probable cause for twenty-five counts based on routine student interaction.

7.      The Fourth Circuit recognizes § 1983 malicious prosecution claims for seizure pursuant to process unsupported by probable cause. *Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012) ("seizure pursuant to legal process that was not supported by probable cause").

8.      Plaintiff was arrested, booked, and publicly humiliated (Exs. E–F). Twenty-three charges were dismissed by *nolle prosequi*; two will be dismissed under a deferred disposition without adjudication and without any stipulation to guilt (Ex. U), satisfying the favorable-termination requirement because the prosecution ended "without a conviction" and "not inconsistent with innocence." *Thompson v. Clark*, 596 U.S. 36, 43–44 (2022).

9.      As a **Commissioner** of the **Virginia Law Enforcement Professional Standards Commission**, Sheriff Ward possessed direct knowledge of the constitutional and professional limits on law-enforcement conduct, including the prohibition against initiating or perpetuating criminal charges without probable cause and the duty to avoid prejudicial public statements (Ex. MM).

10.     Despite this heightened responsibility, Ward, upon learning that the warrants had been issued without any sworn probable-cause statement, took no corrective action and allowed the arrests and charges to proceed unchanged. By permitting his Office to rely on unsworn warrants and continuing the prosecution machinery without remedial steps or investigation, Ward effectively ratified the unconstitutional process, demonstrating deliberate indifference and reckless disregard for Plaintiff's Fourth Amendment rights. See *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994); *Knight v. Vernon*, 214 F.3d 544, 552 (4th Cir. 2000) (holding a sheriff individually liable under § 1983 where he had knowledge of and acquiesced in subordinates' unconstitutional conduct).

As a final policymaker for the Botetourt County Sheriff's Office, Ward's ratification also constitutes the act of the Office itself. See *Bland v. Roberts*, 730 F.3d 368, 390–91 (4th Cir. 2013).

## C. Qualified Immunity

11.     Defendants Hix and Ward violated clearly established law: an officer may not seek or execute a warrant absent probable cause supported by a sworn oath or affirmation. *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012) (qualified immunity unavailable where "no reasonable officer could have believed" the warrant valid); *Whiteley v. Warden*, 401 U.S. 560, 564–65 (1971) (warrant issued without sworn factual showing renders ensuing arrest unconstitutional).

12.     Virginia courts have long treated this oath requirement as jurisdictional, not procedural. *Peal v. Commonwealth*, 26 Va. App. 505, 516 (1998) ("A warrant not supported by a sworn statement of probable cause is *void ab initio* and confers no jurisdiction upon the issuing magistrate."); *McCary v. Commonwealth*, 228 Va. 219, 231 (1984) ("Probable cause must appear

within the four corners of the written affidavit or recorded testimony presented to the magistrate."); *Ford v. City of Alexandria*, 37 Va. App. 819, 828 (2002) (reversing conviction where warrant issued without oath was "facially invalid").

13.     No reasonable officer trained in Virginia criminal procedure could have believed that obtaining twenty-five warrants without any sworn probable-cause statement complied with either Va. Code § 19.2-72 or the Fourth Amendment. That defect rendered each warrant *void ab initio* under *Peal v. Commonwealth*, 26 Va. App. 505, 516 (1998), which holds that an arrest warrant issued without an oath or affirmation is jurisdictionally invalid. Longstanding federal law likewise makes clear that a warrant unsupported by a sworn statement of probable cause is constitutionally void. See *Whiteley v. Warden*, 401 U.S. 560, 565–66 (1971). Hix's deliberate use of such facially invalid process—and Sheriff Ward's acquiescence in allowing the arrests and charges to proceed unchanged despite his knowledge of the defect—constitute the kind of supervisory indifference and tacit authorization that trigger individual liability under *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

14.     Their conduct violated clearly established constitutional law.

**D. Damages and Relief**

15.     As a direct and proximate result of Defendants' actions, Plaintiff suffered loss of liberty, deprivation of constitutional rights, humiliation, emotional distress, reputational injury, legal expenses, and other damages to be proven at trial.

16.     Defendants' conduct was willful, wanton, and carried out with reckless disregard for Plaintiff's federally protected rights, warranting punitive damages to deter similar misconduct.

17.     WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor and against Defendants Hix and Ward, jointly and severally, in their individual capacities, for:

a.      Compensatory damages in an amount to be determined at trial;

b.      Punitive damages for willful and malicious misconduct;

c.      Attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

d.      Such other and further relief as this Court deems just and proper.

## COUNT II
## MALICIOUS PROSECUTION / UNLAWFUL SEIZURE
## (AGAINST PROSECUTOR)
## 42 U.S.C. § 1983

(Against Defendant Marshall Lukacs, in her individual capacity)

### A. Incorporation of Allegations

18.     Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

### B. Factual Basis for Fourth-Amendment Violation

19.     This Count is brought under 42 U.S.C. § 1983 for deprivation of Plaintiff's right to be free from seizure and prosecution unsupported by probable cause.

20.     Before any judicial proceedings commenced, Defendant Marshall Lukacs, acting in an investigative capacity, instructed Defendant Kevin Hix to "take out a warrant for any contact made" between Plaintiff Raymond L. Sherwood III and the student complainant visible on school-bus video, without conducting any independent evaluation of probable cause or considering whether the conduct met the statutory intent element of Va. Code § 18.2-57.

21.     That directive was investigative and administrative—not advocative—placing it outside the scope of absolute immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).

22.     Defendant Lukacs knew or recklessly disregarded that the twenty-five warrants sought by Defendant Hix were unsupported by any sworn affidavit or recorded oath as required by Va. Code § 19.2-72. The JDR Clerk later certified that no probable-cause statement existed (Ex. F).

23.     Between July and September 2025, defense counsel Joseph Cockfield made four written requests to the Commonwealth's Attorney's Office seeking the sworn probable-cause affidavits underlying the twenty-five warrants, along with related exculpatory and court-ordered

materials. (Ex. H). These requests sent July 18, August 7, August 26, and September 15, 2025 went entirely unanswered. Neither Defendant Lukacs nor Commonwealth's Attorney John Alexander ever identified any sworn or recorded basis for the warrants.

24.    Their non-responsiveness is consistent with, and later confirmed by, the Office of the Executive Secretary of the Supreme Court of Virginia, which stated in writing on November 13, 2025 that the warrants "were not accompanied by any probable-cause documentation." (Ex. Y).

25.    The unanswered requests and subsequent administrative confirmation substantiate that Lukacs pursued and maintained twenty-five charges without the jurisdictional predicate required under Va. Code § 19.2-72.

26.    Virginia law treats that oath requirement as jurisdictional, not technical. *Peal v. Commonwealth*, 26 Va. App. 505, 516 (1998) (warrant without sworn statement is void *ab initio*); *Lafayette v. Commonwealth*, 30 Va. App. 454, 459 (1999) (probable cause must be in writing or recorded under oath); *Ford v. City of Alexandria*, 37 Va. App. 819, 828 (2002) (unsworn warrant "facially invalid").

27.    Despite knowing that no lawful probable-cause record existed, Lukacs continued the prosecution for months and ignored multiple formal defense requests for those affidavits and related discovery (Ex. H). Her refusal to produce or verify the foundational record demonstrates bad faith and underscores the absence of probable cause supporting the seizure, providing further evidence of malice and reckless disregard for Plaintiff's rights.

28.    On September 30, 2025, she filed a motion to revoke Mr. Sherwood's bond (Ex. Q), then withdrew it the next day while referencing a pending plea offer (Ex. T)— a coercive use of bond authority condemned in *United States v. Goodwin*, 457 U.S. 368, 372 (1982).

29.     She moved to quash defense subpoenas for student-disciplinary records as a "fishing expedition," yet later issued her own subpoena for the same records (Ex. N, M), circumventing the defense and the court's duty under *Anderson v. Commonwealth*, 38 Va. App. 321 (2002), aff'd, 279 Va. 85 (2010), which requires *in camera* review once materiality is asserted. Her selective use of subpoenas and disregard of *Anderson* procedures further show intentional misuse of investigative authority.

30.     These acts—ordering charges, sustaining prosecution on void process, and leveraging bond revocation for plea pressure—were investigative and administrative in nature and directly caused Plaintiff's seizure pursuant to invalid legal process. *Miller v. Prince George's Cnty.*, 475 F.3d 621, 627 (4th Cir. 2007).

31.     The criminal proceedings terminated in Plaintiff's favor when twenty-three charges were dismissed by *nolle prosequi* and the remaining two were deferred without a finding of guilt or no stipulation to facts sufficient for a finding of guilt  (Ex. U), satisfying *Thompson v. Clark*, 596 U.S. 36 (2022).

**C. Immunity and Clearly Established Law**

32.     Defendant Lukacs is not entitled to absolute immunity because her challenged acts advising law enforcement to charge, directing investigative steps, and coercing a plea through bond leverage were not "intimately associated with the judicial phase." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976).

33.     Qualified immunity is likewise unavailable. The duty to ensure that a warrant is supported by sworn probable cause and to refrain from initiating or continuing prosecution absent that predicate was clearly established well before 2025. *Peal*, 26 Va. App. at 516; *Lafayette*, 30 Va. App. at 459; *Messerschmidt v. Millender*, 565 U.S. 535 (2012). No reasonable

44

prosecutor could believe that directing twenty-five charges without individualized probable cause, or maintaining prosecution after learning the warrants were void, was lawful.

34.    As a direct and proximate result of Defendant Lukacs's conduct, Plaintiff suffered loss of liberty, deprivation of due process, humiliation, emotional distress, reputational injury, and substantial financial harm, including legal expenses and loss of earning capacity.

35.    Defendant Lukacs's actions were willful, wanton, and carried out with reckless disregard for Plaintiff's constitutional rights, warranting punitive damages to deter similar misconduct.

36.    WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor and against Defendant Lukacs, in her individual capacity, for:

a.    Compensatory damages in an amount to be determined at trial;

b.    Punitive damages for willful and malicious misconduct;

c.    Attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

d.    Such other and further relief as this Court deems just and proper.

## COUNT III
## BRADY/GIGLIO VIOLATIONS
## SUPPRESSION OF EXCULPATORY EVIDENCE
## PROCEDURAL AND SUBSTANTIVE DUE PROCESS
## 42 U.S.C. § 1983

(Against Defendant Marshall Lukacs, in her individual capacity)

### A. Incorporation of Allegations

37.    Plaintiffs reallege and incorporate all prior paragraphs of this Complaint as though fully set forth herein.

### B. Nature of the Claim

38.    This Count is brought under 42 U.S.C. § 1983 for violations of the Fourteenth Amendment's Due-Process Clause.

39.    It addresses (a) suppression and manipulation of exculpatory evidence required to be disclosed under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and *Anderson v. Commonwealth*, 279 Va. 85 (2010); (b) fabrication and alteration of judicial records; and (c) arbitrary, conscience-shocking abuse of prosecutorial authority.

### C. Factual Basis

40.    Defendant Lukacs personally directed and supervised the handling of *Commonwealth v. Sherwood* in the Botetourt County JDR Court.

41.    From its inception, she knew the arrest warrants were unsupported by any sworn probable-cause statement as required by Va. Code § 19.2-72, yet she nonetheless advanced and maintained the prosecution. (Exs. V, Y).

42.    Between July and September 2025, defense counsel Joseph Cockfield repeatedly emailed Lukacs and Commonwealth's Attorney John Alexander requesting the probable-cause

46

affidavits, expert disclosures, bus-video evidence, and records of non-cooperating parents. No response was ever provided. (Ex. H).

43.    Those emails demonstrate that Lukacs had actual notice of missing *Brady* material and chose to ignore it.

44.    The unanswered defense requests were later corroborated by the Office of the Executive Secretary of the Supreme Court of Virginia, which confirmed in a November 13, 2025 written communication that no sworn probable-cause affidavits, complaints, or recorded statements ever existed for any of the twenty-five warrants. (Ex. Y).

45.     This administrative confirmation establishes that the Commonwealth withheld not merely discoverable Brady material, but the foundational jurisdictional record required to support the charges in the first place. The concealment of this defect deprived Plaintiff of the ability to challenge the legality of the warrants, prepare a complete defense, or confront the prosecution on the absence of any sworn predicate for the charges, thereby violating his procedural and substantive due-process rights.

46.    On September 30 2025, Lukacs issued a subpoena duces tecum to the Botetourt County School Board seeking student-disciplinary records (Ex. R) after having previously moved to quash identical defense subpoenas as a "fishing expedition." (Ex. N). The subpoena was returned without the records requested for 2024–25 and instead contained a blank printout for the 2025–26 school year that was stapled to Lukacs's own SDT and lacking any FILED stamp. (Ex. R).

47.    That document appeared only after counsel had inspected and filmed a certified case file on November 3, 2025 showing no such record, and after counsel had emailed the Clerk

to report the omission. Four days later, a "re-certified" file was produced containing the new record. (Exs. AA, Z).

48.  These events demonstrate that the case file was altered while in official custody and that the alteration directly benefited the Commonwealth by creating the illusion of compliance with discovery obligations suggesting it was introduced belatedly to create the appearance of compliance while maintaining the practical effect of non-disclosure.

49.  The July 7, 2025 Pre-Trial Order signed by Judge Hagan—though available to defense counsel during the underlying criminal case—was omitted from the certified record later produced to undersigned counsel during the civil investigation. The omission occurred after Plaintiff publicly announced his intent to pursue civil-rights litigation and had the effect of concealing a key order demonstrating the court's failure to conduct the in camera review required by Anderson, thereby obstructing counsel's ability to document that due-process violation for this proceeding. (Ex. O).

50.  In addition to those overt actions, earlier filings reflect the same coercive pattern. On June 16, 2025, Assistant Commonwealth's Attorney Lukacs submitted a pleading styled as the *Commonwealth's Response to Defendant's Motion for Bill of Particulars.* The certified copy shows that the document had originally been formatted as a *Motion to Revoke Bond* and that Lukacs manually struck through that title, handwriting "Motion for Bill of Particulars" above it while leaving the final paragraph, though crossed out, to read: "because of Defendant's failure to comply with the terms of his bond … the Commonwealth requests that the defendant's bond be revoked and that a capias be issued for his immediate arrest." (Exs. I–J). This hybrid filing exemplifies the same misuse of prosecutorial authority later repeated in the September 30–

48

October 1 bond-revocation sequence, leveraging the threat of custody to pressure the accused and distort the judicial process. (Exs. Q1–S).

51.    Collectively, these actions involving the misrepresentation of official filings, the concealment of material records from subsequent review, and the use of bond threats for coercive leverage constitute an arbitrary and conscience-shocking abuse of prosecutorial authority within the meaning of *County of Sacramento v. Lewis,* 523 U.S. 833, 849 (1998).

**D. Legal Analysis**

52.    The Fourteenth Amendment guarantees criminal defendants a meaningful opportunity to present a complete defense. Suppression or fabrication of material evidence by a state actor violates that right. *Kyles v. Whitley*, 514 U.S. 419 (1995); *Jean v. Collins*, 221 F.3d 656, 660 (4th Cir. 2000).

53.    Virginia law independently requires an *in camera* judicial review of school records once their materiality is asserted, and Lukacs knew that requirement but maneuvered to prevent its application. *Anderson v. Commonwealth*, 38 Va. App. 321 (2002), aff'd 279 Va. 85 (2010).

54.    A prosecutor who directs evidence destruction or withholds exculpatory material in bad faith acts outside her advocative role and is not entitled to absolute immunity. *Yarris v. County of Delaware*, 465 F.3d 129, 136 (3d Cir. 2006); *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993).

55.    Defendant Lukacs's conduct was investigative, administrative, and retaliatory— not judicial—placing her outside absolute immunity. Nor is she entitled to qualified immunity, as the duty to disclose and preserve exculpatory evidence has been clearly established for decades.

*Walker v. Bowen*, 372 F. Supp. 2d 541, 551 (W.D. Va. 2005) ("A reasonable prosecutor would know that suppressing *Brady* material violates clearly established law.").

56.     Her strategic modification and presentation of records for coercive leverage, coupled with her selective issuance of subpoenas after moving to quash identical defense requests, demonstrates deliberate indifference and a malicious abuse of prosecutorial power. *Wearry v. Cain*, 577 U.S. 385 (2016). (Ex. I, S).

**E. Damages and Relief**

57.     As a direct and proximate result of Defendant Lukacs's conduct, Plaintiff suffered loss of liberty, deprivation of due process, emotional distress, reputational harm, and substantial financial injury, including legal expenses and lost earning capacity.

58.     Defendant's actions were willful, wanton, and carried out with reckless disregard for Plaintiff's constitutional rights, warranting punitive damages to deter similar misconduct.

59.     Because the constitutional deprivations described herein were intertwined with and furthered by the coordinated acts of other state officials—including those of the Botetourt County Sheriff's Office and the Commonwealth's Attorney's Office—Defendant Lukacs is jointly and severally liable with any co-defendants found to have participated in or ratified the same course of conduct.

60.     WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor and against Defendant Marshall Lukacs, jointly and severally with all other liable defendants, in her individual capacity, for:

a.     Compensatory damages in an amount to be determined at trial;
b.     Punitive damages for willful and malicious misconduct;
c.     Attorneys' fees and costs under 42 U.S.C. § 1988; and
d.     Such other and further relief as this Court deems just and proper.

**COUNT IV**
**RETALIATION AND ABUSE OF POWER**
**42 U.S.C. § 1983**

(Against Defendants Marshall Lukacs and John Alexander, individually)

**A. Incorporation of Allegations**

61. Plaintiffs reallege and incorporate all prior paragraphs of this Complaint as though fully set forth herein.

**B. Nature of the Claim**

62. This Count arises under 42 U.S.C. § 1983 for violations of the Fourteenth Amendment's substantive due-process guarantee and the First Amendment's protection against retaliation for lawful speech, petitioning, and defense of one's own case.

63. The claim addresses Defendants' coordinated use of official authority to punish and deter Plaintiff's protected conduct—his assertion of innocence, exercise of due-process rights, and efforts to obtain exculpatory evidence and judicial review.

**C. Factual Basis**

64. After receiving a report from Botetourt County Probation Officer Kasey Thomas concerning Mr. Sherwood's alleged contact with her daughter, Defendant Hix, then the School Resource Officer assigned to James River High School, reviewed the corresponding school-bus surveillance footage. Rather than conducting an independent evaluation of whether any observable conduct met the statutory definition of assault or battery, Hix sought guidance from Assistant Commonwealth's Attorney Marshall Lukacs.

65. Lukacs instructed him to "take out a warrant for any contact made" visible on the recording. Acting on that directive and under the supervision of Sheriff Ward, Hix procured

51

twenty-five (25) misdemeanor arrest warrants without any sworn affidavit or recorded probable-cause statement. (Ex. D, V, Y).

66.     Between July and September 2025, defense counsel Joseph Cockfield made four written requests to Assistant Commonwealth's Attorney Marshall Lukacs and Commonwealth's Attorney John Alexander seeking the sworn probable-cause affidavits for each of the twenty-five warrants, along with other exculpatory and court-ordered materials. (Ex. H). None of the requests received any response.

67.     Their silence is consistent with, and later confirmed by, the Office of the Executive Secretary of the Supreme Court of Virginia, which stated in writing on November 13, 2025 that the warrants "were not accompanied by any probable-cause documentation." (Ex. Y).

68.     This sequence of issuing warrants without the mandatory oath or affirmation, refusing to identify the missing documents when formally requested, and continuing the prosecution despite knowing no probable-cause record existed demonstrates that Defendants not only lacked lawful basis for the charges but also used the prosecution itself as an instrument of coercion and retaliation.

69.     On June 12, 2025, defense counsel Joseph "Joe" Cockfield, Esq., filed a *Motion for Bill of Particulars* in the Juvenile and Domestic Relations Court, seeking clarification of how the Commonwealth believed ordinary physical contact captured on school-bus video could constitute assault and battery. The motion requested that the prosecution identify with specificity the alleged acts forming the basis of the twenty-five (25) charges (Ex. I).

70.     Four days later, on June 16, 2025, Assistant Commonwealth's Attorney Marshall Lukacs submitted what purported to be the "Commonwealth's Response to Defendant's Motion for Bill of Particulars." The certified copy (Ex. J) reveals that Lukacs reused a *Motion to Revoke*

*Bond* template—striking through that title, handwriting "Motion for Bill of Particulars" above it, yet leaving visible the closing paragraph demanding that "a capias be issued for his immediate arrest." The body of the pleading otherwise tracked the language of a standard opposition to a Bill of Particulars, confirming that Lukacs had actively rewritten the form and could not have overlooked the residual bond-revocation language. Its survival within a routine discovery pleading served as an implicit threat that further litigation could invite confinement. This coercive carry-forward of bond language was intentional, not clerical.

71.     The inclusion of bond-revocation language within a discovery pleading conveyed a clear, implicit message: that further litigation or insistence on constitutional process could result in incarceration. Such signaling, delivered through the formal medium of a court filing, would reasonably be understood by any defendant, and by any experienced defense counsel, as a coercive reminder of the Commonwealth's power to seek custody at will. In this context, the altered filing operated not merely as a procedural irregularity, but as a deliberate reinforcement of the Commonwealth's willingness to leverage detention as a bargaining tool.

72.     The following excerpt from Ex. J, *Commonwealth's Altered Response* (filed June 16 2025 in *Commonwealth v. Sherwood*, JDR No. JA009740/01-25) shows that Defendant Lukacs adapted a bond-revocation motion into a pleading opposing a Bill of Particulars, striking the title but retaining, still legible, the final paragraph demanding that "a capias be issued for his immediate arrest." Its survival in the altered filing underscores that the coercive bond language was intentionally carried forward rather than mistakenly left behind.

COMMONWEALTH OF VIRGINIA,     )        ~~MOTION~~ N FOR BILL OF PARTICULARS
                              )        ~~MOTION TO REVOKE BOND~~
v.                            )
                              )
RAYMOND LEWIS SHERWOOD, III   )        JA009740/01-25

COMES NOW the Commonwealth of Virginia, by his attorney, and in response to the

Defendant's Motion for Bill of Particulars, respectfully states as follows:

1.   That the Defendant's Motion states that the warrants do not state with sufficient

     particularity the nature and character of the offenses so that the Defendant can

     make his defense.

showing with specificity the alleged actions of the Defendant.

Wherefore, ~~because of Defendant's~~ Commonwealth requests Court to Provide Defendant's Bill of ~~failure to comply with the terms of his bond, the~~ PARTICULARS

~~Commonwealth requests that the defendant's bond be revoked and that a capias be issued for his~~

~~immediate arrest and he be remanded to jail pending his trial.~~

Respectfully submitted,

COMMONWEALTH OF VIRGINIA

By _____
Assistant Commonwealth's Attorney

73.    On September 30, 2025, Assistant Commonwealth's Attorney Marshall Lukacs

caused her legal assistant, Heather Gilliland, to email defense counsel two subpoenas duces

tecum together with a Motion to Revoke Bond (Ex. P). The motion, signed by Lukacs, cited only

the original May 2 unsecured bond order and omitted any reference to the amended bond orders

entered on May 14 and July 7, 2025 — both of which list Lukacs as the prosecuting attorney of

record and at which she personally appeared (Exs. R–L). Those amendments expressly

54

superseded the May 2 conditions and authorized limited contact under court supervision. By relying on the obsolete order, Lukacs knowingly misrepresented the controlling terms of release.

74.     At 10:00 a.m. the next morning, Lukacs filed a Motion to Withdraw Bond Revocation (Ex. S) claiming she had "been informed that the bond had previously been amended." That representation was false: Lukacs had been present for both amendment hearings as shown from Judge Hagan's court orders for two prior dates (5/14/2025 and 7/7/2025) (Exs. R–L).

75.     Having previously served as a prosecutor in two Virginia jurisdictions, undersigned counsel is personally familiar with standard bond-revocation procedures. No reasonable prosecutor would move to revoke bond without first confirming both the operative order and a bona fide violation. Defendant Lukacs's September 30 motion therefore reflected bad faith and a retaliatory intent to coerce a plea through abuse of process.

76.     Defense counsel promptly filed a written opposition disputing the factual and legal basis of the Commonwealth's revocation motion (Ex. Q-2). The response highlighted that the conduct alleged lawful contact with potential witnesses did not violate any bond condition then in effect, and that the Commonwealth had been present for prior bond amendments expressly authorizing supervised contact. The following morning, at 10:00 a.m., Lukacs withdrew her motion (Ex. S), effectively conceding that no violation existed.

77.     Around 8 p.m. that same day, Lukacs emailed defense counsel acknowledging the withdrawal and adding that she "didn't think [she] had time to write up a formal offer," but that "it will be in line with what we discussed" — an unmistakable reference to a pending plea proposal (Ex. T). er assistant sent a separate email transmitting the withdrawn motion (Ex. T). This sequence establishes a continuous pattern of coercion, a knowingly baseless revocation

55

threat timed for maximum psychological pressure, immediately followed by a plea overture once its purpose was fulfilled.

78.     Taken together, the June 16 altered filing and September 30 motion reveal a continuous strategy of using bond threats as leverage to coerce a plea rather than address any legitimate violation.

79.     That formal offer did in fact materialize several weeks later, when the Commonwealth extended a plea agreement, accepted by the JDR court on October 14, 2025, providing that the Commonwealth would agree to defer two (2) of the twenty-five (25) misdemeanor assault and battery charges while dismissing by *nolle prosequi*, the remaining twenty-three (23). Pursuant to the agreement, the two deferred charges were taken under judicial advisement on the condition that Mr. Sherwood enter pleas of *nolo contendere* (no contest) to each. In exchange, the Juvenile & Domestic Relations Court made no finding of guilt and no finding of facts sufficient to convict, with both charges to be dismissed and eligible for expungement upon Mr. Sherwood's compliance with the agreed conditions—specifically, that he have no contact with the complainants, keep the peace, and remain of good behavior (Ex. U)

80.     Despite that outcome, which legally constitutes a favorable termination, Commonwealth's Attorney John Alexander made extrajudicial statements to *The Roanoke Times* and *WDBJ7* on October 29, 2025, that mischaracterized the disposition and stigmatized Mr. Sherwood. In comments to *The Roanoke Times*, Alexander described Mr. Sherwood's "touching that verged on inappropriate," followed by the statement that "there was no evidence to support charges of sexual assault," and later noting that "another factor taken into account was that Sherwood is no longer working as a school bus driver." Read together, those statements have understandably been interpreted as suggesting sexual misconduct or moral unfitness, although no

56

such finding was ever made and the matter remains under judicial deferral with no finding of guilt or facts sufficient to convict. (Exs. FF–GG) These statements, made after judicial disposition and under color of office, were retaliatory in nature—intended to chill further assertion of rights, protect the Commonwealth's Attorney's Office from scrutiny, and foreclose Mr. Sherwood's future employment.

81.     In the WDBJ7 coverage, undersigned counsel publicly addressed Mr. Alexander's statements and provided a clarifying response on behalf of Mr. Sherwood, which was published alongside the article. (Ex. HH). When Mr. Alexander made no effort to correct or retract his remarks, undersigned counsel sent him a formal clarification letter on October 31, 2025, reiterating the inaccuracies and requesting correction. (Ex. II). Mr. Alexander never responded, nor did he retract or amend his prior comments, leaving the stigmatizing narrative uncorrected in the public record.

82.     These statements, made under color of office after judicial disposition, were retaliatory in nature and intended to chill further assertion of rights, protect Defendants from exposure of misconduct, and foreclose Plaintiff's future employment.

**D. Legal Analysis**

83.     Government officials violate substantive due process when they engage in conduct that "shocks the conscience" by abusing power to punish or intimidate an individual for exercising constitutional rights. *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).

84.     Retaliatory prosecution or selective enforcement against an individual for asserting legal rights or criticizing government conduct violates clearly established First-Amendment principles. *Hartman v. Moore*, 547 U.S. 250, 256–57 (2006); *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018).

85.     A prosecutor who fabricates evidence, manipulates judicial records, or conditions liberty on coerced plea acceptance acts outside the scope of absolute immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993); *Yarris v. County of Delaware*, 465 F.3d 129, 136 (3d Cir. 2006).

86.     The coercive message became reality when, on September 30, 2025, ACA Lukacs formally moved to revoke Mr. Sherwood's bond. (Ex. Q). The motion was based on conduct reflecting lawful defense investigation, contacting potential student witnesses, and was withdrawn only after defense counsel filed written opposition. In the same exchange, Lukacs referenced a "pending plea offer," linking the withdrawal of the revocation motion to plea negotiations. (Ex. T). Taken together, the June 16 filing and the September 30 motion reveal a sustained tactic: using the threat of incarceration to compel a plea rather than address any legitimate violation.

87.     Such conduct is constitutionally impermissible. Prosecutors may not wield charging or detention authority to penalize or chill the exercise of legal rights. See *United States v. Goodwin*, 457 U.S. 368, 372 (1982); *Blackledge v. Perry*, 417 U.S. 21, 27–28 (1974); *Wayte v. United States*, 470 U.S. 598, 608 (1985); *United States v. Wilson*, 262 F.3d 305, 316–17 (4th Cir. 2001). Using bond revocation as plea leverage also violates due process and voluntariness. See *Santobello v. New York*, 404 U.S. 257, 262 (1971); *United States v. Taylor*, 240 F.3d 425, 428–29 (4th Cir. 2001); *North Carolina v. Pearce*, 395 U.S. 711, 725 (1969). When liberty itself becomes a bargaining chip, the prosecution crosses "the line of constitutional permissibility." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978).

88.     The deliberate filing and overnight withdrawal of the September 30 bond revocation motion—premised on a superseded order and followed within hours by a plea overture—illustrate a conscious pattern of coercion rather than an isolated lapse of judgment.

89.     This episode exemplifies an arbitrary and retaliatory misuse of prosecutorial authority intended to hinder the defense and exert coercive leverage toward a plea. Such conduct transforms prosecutorial discretion into a coercive instrument, violating the Due Process Clause and the ethical duty of fairness owed by every Commonwealth's Attorney.

90.     Here, the cumulative pattern of making unfounded bond-revocation threats, strategically suppressing *Brady* material, and publishing defamatory post-disposition statements constitutes a deliberate abuse of power with no legitimate prosecutorial or law-enforcement objective.

91.     Each Defendant acted with animus and a retaliatory motive: Lukacs by coercing plea leverage and suppressing exculpatory evidence; and Alexander by making extrajudicial statements to the media to stigmatize Plaintiff and defend the prosecution's misconduct;

**E. Damages and Relief**

92.     As a direct and proximate result of Defendants' retaliatory and abusive conduct, including the deliberate use of late-night bond motions and public misrepresentations, Plaintiff suffered emotional distress, reputational injury, loss of employment, and deprivation of constitutional liberty interests.

93.     Defendants' conduct was willful, malicious, and in reckless disregard of Plaintiff's constitutional rights, justifying punitive damages.

59

94.     Because this retaliation was carried out jointly by officials of the Commonwealth's Attorney's Office under color of law, Defendants Lukacs and Alexander are jointly and severally liable for all damages arising from their coordinated misconduct

95.     WHEREFORE, Plaintiff respectfully requests judgment in his favor and against Defendants Marshall Lukacs, Reallege and incorporate, and Kevin Hix, jointly and severally, in their individual capacities, for:

   a.   Compensatory damages in an amount to be determined at trial;

   b.   Punitive damages for willful and malicious misconduct;

   c.   Attorneys' fees and costs under 42 U.S.C. § 1988; and

   d.   Such further relief as the Court deems just and proper.

## COUNT V – EQUAL PROTECTION (CLASS-OF-ONE)
## 42 U.S.C. § 1983

(Against Defendants County of Botetourt, Virginia; Matthew T. Ward, in his individual capacity; Kevin M. Hix, in his individual capacity; William G. Bentley, in his individual capacity; John R.H. Alexander, in his individual capacity; and Marshall Lukacs, in her individual capacity.)

### A. Incorporation of Allegations

96.    Plaintiffs Raymond L. Sherwood III, Lauren R. Sherwood, B.B., H.B., and Savannah R. Beckner ("Plaintiffs") repeat and reallege all preceding paragraphs as if fully set forth herein.

### B. Legal Basis: Fourteenth Amendment Equal Protection (Class-of-One Theory)

97. Plaintiffs bring this claim under a class-of-one theory of equal protection. Although the discriminatory state action was directed at Mr. Sherwood, Defendants' arbitrary and irrational treatment foreseeably and directly injured all Plaintiffs—his wife and the three children—whose reputations, emotional well-being, educational environments, and familial stability were severely harmed as an immediate consequence of Defendants' actions.

98. The Fourteenth Amendment prohibits state actors from intentionally treating an individual differently from others similarly situated without any rational basis for the differential treatment.

99. Botetourt County has, in recent years, invested substantial resources into law-enforcement technology, including multimillion-dollar enhancements to its interoperable radio-tower system, emergency-communications upgrades, and data-link infrastructure (Ex. M-__). These investments dramatically expanded the operational, surveillance, and communication capabilities of the Sheriff's Office.

100. By contrast, the County invested nothing in systems designed to safeguard the procedural or constitutional rights of accused persons, including:

(a) no digital tracking of probable-cause submissions;

(b) no automated discovery-compliance protocols;

(c) no audit-logging of warrant or charging processes; and

(d) no parity mechanisms ensuring that defendants receive the procedural safeguards necessary to challenge allegations or validate probable cause.

101. This structural imbalance of technology to empower enforcement, with no corresponding investment in systems protecting due process, helped create the environment in which Mr. Sherwood was subjected to singularly irregular and punitive treatment not applied to any other similarly-situated defendant in Botetourt County.

## A. Absence of Probable-Cause Documentation — A Singular Deviation

102. The Botetourt County JDR Clerk confirmed that the court historically received, logged, and maintained probable-cause affidavits and juvenile petitions, but that at some point this practice 'changed,' such that the Clerk's Office no longer receives those affidavits and petitions. (Ex. EE)

103. Yet in Mr. Sherwood's case, no probable-cause documentation exists anywhere in the County's systems. It was never uploaded to the magistrate record, never placed in the court file, never logged in the JDR digital system, and never produced to defense counsel despite four written requests spanning months (Ex. H).

104. Defendant Lukacs ignored each request, and Defendant Alexander, who was copied, provided no explanation or corrective action (Ex. H).

105. Upon information and belief, no other defendant charged with assault and battery or comparable misdemeanors has ever been denied access to their foundational probable-cause materials. This deviation appears unique to Mr. Sherwood.

62

**B. Dual JDR Case Entries — A Defect Appearing Only in Sherwood's Matter**

106. The Botetourt County JDR online portal displays two separate case entries for Mr. Sherwood arising from the same alleged incident, containing overlapping but non-identical data. Notably, the Defendant's name appears differently in each entry, listed once as 'SHERWOOD III, RAYNOND LEWIS' and again as 'SHERWOOD, RAYMOND LEWIS; III.' (Ex. M-__).

107. Upon information and belief, no other defendant in the County's system is known to have been subject to such an irregularity.

**C. Comparator Set #1 — Felony Sexual Offenders Treated More Favorably**

108. Defendant Bentley issued a county-wide Facebook press release identifying Mr. Sherwood by name and portraying him as a sexual threat before any affidavit, hearing, or validation of probable cause (Ex. __).

109. By contrast, two other Botetourt County defendants indicted on March 11, 2025 for serious felony sexual offenses, including forcible sodomy, aggravated sexual battery, attempted rape, child-exploitation offenses, and possession of child pornography, all extremely serious felony offenses, **received no press release**, and no defamatory publication through Sheriff's Office channels. (Ex. M-__).

110. Their indictments reflect that a probable-cause basis existed at least on its face and that their charges were further reviewed in the presence of a grand jury, which only emphasizes the contrast with the Sheriff's Office's treatment of Mr. Sherwood.

111. There exists no rational basis for treating a school-bus driver accused of misdemeanor conduct more harshly than individuals charged with violent or sexually violent felonies.

63

**D. Comparator Set #2 — Political Favor Networks Within the County**

112. Upon information and belief, Botetourt County maintains longstanding informal political networks surrounding a prominent local family with historical ties to County leadership, law-enforcement decision-makers, and public-safety institutions (Ex. M-__).

113. Individuals within this political orbit have historically received less aggressive charging decisions, enhanced informational transparency, and discretionary de-escalation unavailable to outsiders.

114. Mr. Sherwood, a disabled veteran unaffiliated with any such networks, was instead denied probable-cause materials, forced to navigate dual docket irregularities, and publicly shamed through an unprecedented press release, all before he ever entered a Botetourt County courtroom, where exculpatory and impeachment evidence was withheld and bond-revocation threats were used to influence his actions. Even after a plea agreement had been entered, an elected prosecutor chose not to remain silent when Mr. Sherwood responded to a Roanoke Times inquiry and instead publicly portrayed him as a sexual threat to society, compounding the earlier defamation.

**E. Comparator Set #3 — The Anonymous Insider Reporter**

115. Defendants placed extraordinary reliance on the report of an insider parent with professional relationships throughout the County's criminal-justice infrastructure, including family ties to the Botetourt County Sheriff's Office through her sister and brother-in-law, both of whom were law-enforcement officers.

116. Although the insider acted solely as a parent, Defendants treated her report with heightened credibility due to her professional associations, triggering an escalated law-enforcement response inconsistent with typical handling of student-interaction complaints.

117. Yet the insider permitted her child to continue riding Mr. Sherwood's bus after the alleged incident, including after her April 17, 2025 report and even after the later of the two offense dates charged in the warrants, April 22. The child again rode Mr. Sherwood's bus on the morning of April 23, 2025, before Mr. Sherwood was suspended that evening, which significantly undermines any claim of urgency, danger, or credibility in the accusation. (Ex. M-).

118. Similar allegations in the County have historically been routed through school administrative channels rather than immediate criminalization. This harsher criminal response was directed only at Mr. Sherwood.

## F. Press Release as Arbitrary and Unequal Enforcement

119. The decision by Defendant Bentley to publish an official press release identifying Mr. Sherwood and amplifying allegations was an arbitrary deviation from County practice.

120. No comparator defendant charged with violent or sexual felonies received such treatment, notwithstanding far greater public-safety implications.

## G. No Rational Basis for Differential Treatment

121. There exists no legitimate governmental purpose for:

(a) denying probable-cause documentation to a criminal defendant;

(b) creating or maintaining dual docket entries;

(c) refusing foundational charging documents after repeated requests;

(d) issuing a public press release for a misdemeanor while withholding such releases for sexual felonies;

(e) escalating insider allegations while disregarding contradictory conduct; or

(f) deploying advanced enforcement technology without corresponding procedural safeguards for accused individuals.

122. Defendants' conduct was arbitrary, targeted, and irrational, motivated by:

(a) political favoritism unavailable to Mr. Sherwood;

(b) undue reliance on insider relationships;

(c) the structural imbalance of County technology investments;

(d) public-relations motives; and

(e) animus toward Mr. Sherwood as a disabled veteran outsider to County political networks.

## H. Resulting Harm

123. As a direct and proximate result of Defendants' unequal, arbitrary, and irrational treatment, each Plaintiff suffered individualized harm, including reputational damage, emotional and psychological trauma, disruption of familial and educational stability, financial loss, legal expenses, and continuing community stigma.

124. Plaintiffs are entitled to compensatory damages, punitive damages, declaratory relief, and all other relief authorized under 42 U.S.C. § 1983.

## COUNT VI
## STIGMA-PLUS DUE PROCESS VIOLATION
## 42 U.S.C. § 1983

(Against Defendants Matthew T. Ward, William G. Bentley, John R.H. Alexander, Marshall Lukacs, Timothy A. McClung, and the Botetourt County School Board, in their respective individual—or municipal—capacities as pleaded.)

### A. Incorporation of Allegations

125.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

### B. Legal Basis: Fourteenth-Amendment Liberty Interest

126.    This Count is brought under 42 U.S.C. § 1983 for deprivation of Plaintiff's liberty interest in his reputation and occupation without due process of law, in violation of the Fourteenth Amendment.

127.    Under the "stigma-plus" doctrine, a plaintiff states a claim when reputational harm inflicted by the state is coupled with a tangible alteration of legal status or right, such as termination from public employment. *Sciolino v. City of Newport News*, 480 F.3d 642, 646 (4th Cir. 2007); *Ridpath v. Bd. of Governors of Marshall Univ.*, 447 F.3d 292, 308 (4th Cir. 2006).

128.    Before any public statements were issued, Defendant Kasey L. Thomas, acting under color of state law in her capacity as a sworn Virginia Probation and Parole Officer, reported to school officials an allegation relayed to her by her minor daughter, a high-school student and one of the two complainants. Thomas did not witness any conduct herself; rather, she heard her daughter describe something she believed was inappropriate and informed her daughter that if it happened again she would report it, which she ultimately did. School personnel then notified Lt. Hix, who obtained a formal statement from Thomas shortly thereafter. Because Thomas was a state officer whose position conferred heightened credibility and perceived

67

authority, her report materially influenced the initiation and direction of the investigation. Although Thomas's statements were not publicly disseminated, they formed a foundational component of the stigmatizing narrative later repeated and amplified by the Sheriff's Office and the Commonwealth's Attorney's Office, thereby contributing to the causal chain that produced the stigmatizing public statements later made by the Sheriff's Office and the Commonwealth's Attorney's Office.

**C. The Stigma Element – Public Defamation by State Actors**

129.    Defendants William G. Bentley and Matthew T. Ward, acting under color of state law, issued an official press release on May 6 followed by a subsequent statement to a media outlet the next day. May 7, 2025 (Exs. E–F).

130.    The May 6, 2025 press release is defamatory per se because it falsely and gratuitously associated Plaintiff's name with accusations of sexual or indecent misconduct toward children, imputing unchastity and criminal moral depravity. (Ex. E) The Sheriff's Office publicly identified bus driver Raymond Lewis Sherwood III as the suspect in a school assault investigation, specifying that it arose from alleged misconduct involving a school bus driver and that the "nature of the alleged contact did not meet the statutory criteria for sexual battery, as the reported touching did not involve intimate areas of the body."

131.    By invoking the sexual-battery statute by name only to disclaim its applicability, the statement unnecessarily introduced sexualized imagery into the public narrative and invited the public to infer that Plaintiff's alleged conduct toward students was of a sexual nature. Under Virginia law, words which "tend to impute to a person unchastity or sexual misconduct" are *defamatory per se. Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 7 (1954). Here, the official

68

statement falsely implied that Plaintiff engaged in inappropriate physical contact with minors serious enough to be investigated under a sexual-battery framework.

132.    By gratuitously referencing a sexual-battery statute, the Sheriff's Office cast Mr. Sherwood in the light of a suspected sexual offender that is precisely the kind of accusation the *per se* rule is designed to capture. The average reader, encountering a government press release about bus driver misconduct with mention of sexual-battery criteria, would reasonably believe the subject engaged in quasi-sexual acts toward children. Such an imputation constitutes defamation per se because it ascribes to the Plaintiff conduct "unfit to associate with others" and "wholly inconsistent with the morals of a decent man," rendering special damages unnecessary. *See Tronfeld v. Nationwide*, 272 Va. 709, 713 (2006).

133.    The May 7, 2025 *WSET* article quoting a representative of the Botetourt County Sheriff's Office is defamatory per se because it falsely imputes to Mr. Sherwood sexual or indecent contact with minors, conduct universally recognized as involving moral turpitude. (Ex. F). The statement that "parents … reached out about inappropriate contact" and that the incidents were *"not hugs and high fives"* was a deliberate and inflammatory comment designed to contradict the public understanding that the alleged contact was innocent and nonsexual.

134.    Under Virginia law, any publication that imputes "unchastity or sexual misconduct" is defamatory per se. *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 7 (1954). The phrase "inappropriate contact" — when used by law enforcement in the context of children on a school bus — carries a clear sexual connotation and suggests predatory behavior. The Sheriff's Office's choice to use that term, while withholding exculpatory context, accused Sherwood of being a sexual aggressor toward minors. Such a statement inherently exposes him

69

to public hatred, contempt, and ridicule, satisfying the *per se* standard without the need to prove special damages.

135.   Because the underlying arrest warrants were void for lack of sworn probable cause (Ex. V, Y), the press releases rested on void process and constitute ongoing state-sponsored defamation under color of law.

136.   Between July and September 2025, defense counsel Joseph Cockfield made four written requests to the Commonwealth's Attorney's Office seeking the sworn probable-cause affidavits underlying the twenty-five warrants, as well as related exculpatory and court-ordered materials. (Ex. H). Neither Assistant Commonwealth's Attorney Marshall Lukacs nor Commonwealth's Attorney John Alexander ever responded. Their repeated silence—despite formal inquiries—demonstrates that prosecutors knew no sworn probable-cause documentation existed and yet allowed the Sheriff's Office to publicly portray Plaintiff as a criminal threat. The refusal to disclose the absence of probable cause amplified the defamatory narrative by concealing the foundational defect in the warrants and ensuring the public would interpret the allegations as legitimate criminal accusations.

137.   These omissions were not accidental. On November 3 and again on November 6, 2025, JDR Clerk Pamela Jarvis certified that the case file contained no probable-cause affidavit, no sworn complaint, no oral-recording certification, and no supporting documentation of any kind for the twenty-five warrants. (Ex. V). In a follow-up conversation with undersigned counsel—lawfully recorded under Virginia's one-party-consent statute and transcribed for accuracy—Jarvis further explained that the JDR Court had not been receiving juvenile petitions or arrest warrants from either the magistrate's office or the Sheriff's Office for a period of time

70

prior to counsel's request. The contents of that conversation are fully consistent with her written certifications (Exs. DD–EE).

138.    That local confirmation of the absence of any probable-cause documentation was later independently confirmed by the Office of the Executive Secretary of the Supreme Court of Virginia, which stated in a November 13, 2025 written communication that none of the twenty-five warrants "were accompanied by any probable-cause documentation." (Ex. Y). Together, these confirmations establish that Defendants publicly disseminated stigmatizing allegations of sexual or indecent misconduct knowing that the warrants lacked the sworn factual predicate required by Va. Code § 19.2-72. The decision to publicize accusations while suppressing the fact that there was no lawful probable cause further contributed to a false and defamatory narrative and intensified the constitutional injury underlying this stigma-plus claim.

139.    Defendant Commonwealth's Attorney John Alexander amplified the stigma on October 29, 2025, by making extrajudicial statements to *The Roanoke Times* and *WDBJ7 News*, claiming that Mr. Sherwood's "touching verged on inappropriate," that "there was no evidence to support charges of sexual assault," and that "another factor taken into account was that Mr. Sherwood is no longer working as a school bus driver." (Exs. FF–GG).

140.    Read together, these statements falsely implied sexual misconduct or moral unfitness, although no such finding was ever made and the case remained under judicial deferral with no adjudication of guilt. Such defamation by a public official acting under color of law constitutes a constitutional injury when coupled with a tangible loss of legal status. *Paul v. Davis*, 424 U.S. 693, 708–09 (1976).

71

141.    Alexander is not entitled to absolute prosecutorial immunity because these statements were made extrajudicially to the press and were not intimately associated with the judicial phase of the criminal process. *Buckley v. Fitzsimmons*, 509 U.S. 259, 277–78 (1993).

**D. The Plus Element – Termination and Loss of Legal Status**

142.    The stigmatizing statements from Defendants were issued in conjunction with Plaintiff's termination from public employment with the Botetourt County School Board (Ex. A).

143.    Defendant Timothy A. McClung, acting under color of state law as Human Resources Director, issued termination letters dated May 2 and May 9, 2025, stating that Plaintiff had been recommended for termination due to "unprofessionalism when it comes to [his] interaction with female students on the bus." (Ex. A). This language explicitly incorporated the defamatory narrative originating from the Sheriff's Office and Commonwealth's Attorney's Office.

144.    The School Board ratified this action by voting to terminate Plaintiff on May 8, 2025—within the ten-day appeal period—without providing him any meaningful opportunity to contest the charges or clear his name. This foreclosed his property interest in continued employment and constituted the "plus" element required under *Sciolino* and *Ridpath* (Exs. A–C).

145.    Defendant McClung's termination letters and the School Board's ratification demonstrate that Plaintiff's reputation and employment were destroyed through interconnected acts of the same state apparatus, without any constitutionally adequate name-clearing procedure. See *Codd v. Velger*, 429 U.S. 624, 627 (1977) ("[W]hen a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."). Although certain defamatory statements were published in the days immediately preceding and following Plaintiff's termination, they were part of a

72

single, continuous course of official conduct by the same actors. The Sheriff's Office's May 6–7 public statements describing Plaintiff's conduct as "inappropriate contact" and "not hugs and high fives" were materially consistent with the justification cited in Defendant McClung's May 2 and May 9 termination letters and ratified by the School Board's May 8 vote. (Exs. E–F).

146.    The close timing and overlapping substance of these actions establish a single, coordinated sequence of stigmatization and termination that simultaneously destroyed Plaintiff's reputation and employment without due process. Under *Ridpath v. Bd. of Governors of Marshall Univ.*, 447 F.3d 292, 309–10 (4th Cir. 2006), and *Sciolino v. City of Newport News*, 480 F.3d 642, 646–48 (4th Cir. 2007), defamatory statements made in close temporal proximity to, and ratified through, an adverse employment decision satisfy the "in conjunction with" element of the stigma-plus test. See also *Cannon v. Village of Bald Head Island*, 891 F.3d 489, 500–01 (4th Cir. 2018) (post-deprivation statements actionable when "so closely connected in time and substance" that they form "a single transaction").

### E.  Municipal Liability – Monell and Ratification

147.    The Botetourt County School Board is liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), because the constitutional deprivation was executed pursuant to an official policy or custom.

148.    Through its final policymakers (the Board Members and/or Superintendent), the School Board ratified the termination decision by acting on information supplied by law enforcement and prosecutors without independent review or affording Plaintiff any constitutionally required name-clearing hearing. That ratification made the Board the "moving force" behind the constitutional violation. See *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986); *Codd v. Velger*, 429 U.S. 624, 627 (1977).

**F. Family-Unit Stigma and Tangible Harms to Lauren Sherwood, Savannah Beckner, B.M.B., and H.M.B.**

149.    The stigmatizing press releases, media statements, and termination letters also inflicted direct harm on Plaintiff's wife, Lauren Sherwood, and on Plaintiff's three daughters, Savannah Beckner, B.B., and H.B., who were publicly associated with the defamatory allegations. These statements foreseeably caused community hostility, school-based stigma, and emotional trauma to each of them.

150.    The children's educational environment was materially altered. Following the Sheriff's Office press releases and media statements, the girls were withdrawn from in-person instruction for their safety and were forced into virtual learning, losing access to school activities, extracurricular programs, and peer relationships.

151.    These educational disruptions constitute a tangible alteration of legal status under *Ridpath*, as the children were deprived of full access to public education due to state-created stigma.

152.    Lauren Sherwood suffered loss of familial companionship, fear, anxiety, emotional trauma, and community stigma resulting from the State's defamatory portrayal of her husband as a sexual aggressor toward minors. These harms to Lauren Sherwood and the children are derivative and foreseeable consequences of the unconstitutional stigmatization and deprivation imposed upon Mr. Sherwood.

**G. Damages and Relief**

153.    As a direct and proximate result of Defendants' conduct, Plaintiff Raymond Sherwood suffered loss of employment, reputational injury, emotional distress, financial harm, and deprivation of due-process rights.

**H. Damages – Lauren Sherwood, Savannah Beckner, B.B., and H.B.**

154.    As a direct and foreseeable result of Defendants' conduct, Plaintiffs Lauren Sherwood, Savannah Beckner, B.B., and H.B. suffered:

a.  Loss of familial companionship and emotional security;

b.  Severe emotional distress, fear, and trauma from seeing their husband and father-figure publicly labeled as a sexual predator;

c.  Educational disruption, including forced virtual learning, withdrawal from activities, and loss of access to supportive school environments;

d.  Community stigma;

e.  Safety concerns and social isolation;

f.  Ongoing reputational harm within their school and neighborhood community.

155.    Defendants' actions were willful, wanton, and carried out with reckless disregard for Plaintiff's constitutional rights, warranting punitive damages to deter similar misconduct.

156.    Because the constitutional deprivations described herein were intertwined with and furthered by the coordinated acts of multiple state officials and agencies—including the Sheriff's Office and the Commonwealth's Attorney's Office—each Defendant named in this Count is jointly and severally liable with any co-defendants found to have participated in or ratified the same course of conduct.

157.    These reputational and occupational injuries have been quantified through a preliminary economic-damages analysis conducted by expert economist Prab Multani, whose November 13, 2025 report concludes that Mr. Sherwood faces substantial past and future economic losses, including lost wages, diminished future earning capacity, impaired retirement

contributions, and reduced long-term labor-market prospects. (Ex. KK). These findings further establish the extent of harm caused by Defendants' stigmatizing and unconstitutional conduct.

158.    WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor and against Defendants Bentley, Ward, Lukacs, Alexander, McClung, and the Botetourt County School Board, jointly and severally, in their individual capacities, for:

    a.    Compensatory damages in an amount to be determined at trial;

    b.    Punitive damages for willful and malicious misconduct;

    c.    Attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

    d.    Such other and further relief as this Court deems just and proper.

## COUNT VII
## AMERICANS WITH DISABILITIES ACT (TITLE II)
## DISABILITY DISCRIMINATION
## 42 U.S.C. § 12132

(Against the County of Botetourt and Sheriff Matthew T. Ward in his official capacity)

### A. Incorporation of Allegations

158.    Plaintiff Raymond L. Sherwood III realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

### B. Legal Basis: ADA Title II

159.    Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

160.    A "public entity" includes any county government and any department, agency, or instrumentality thereof, including Sheriff's Offices. 42 U.S.C. § 12131(1).

161.    To state a claim under Title II, a plaintiff must allege:

(a) he is a qualified individual with a disability;

(b) he was excluded from participation in or denied the benefits of a public service, program, or activity, or otherwise discriminated against; and

(c) such exclusion, denial, or discrimination was by reason of his disability.

### C. Ray Sherwood's Disability and Qualification

162.    Plaintiff Raymond Sherwood is a 100% service-connected disabled veteran with cognitive, processing, and memory-related impairments well known to Botetourt County officials (Ex. ___). He is a qualified individual with a disability within the meaning of Title II.

77

**D. County Law-Enforcement Programs and Services**

163.    Botetourt County, through the Botetourt County Sheriff's Office ("BCSO"), operates public-safety programs, arrest procedures, investigatory processes, dispatch systems, and custodial procedures that constitute "programs" and "activities" of a public entity under Title II.

164.    Sheriff Ward is the final policymaker for BCSO programs and activities, including arrest decision-making, technology-assisted investigations, public communications, records management, and custodial processing. Sheriff Ward is also the final policymaker for all Botetourt County Jail operations, including transport, intake, holding, pretrial detention, custodial processing, records management within the jail, and all ADA/§504 compliance obligations applicable to individuals in custody.

**E. Additional Evidence of Disability-Related Discrimination by Botetourt County Public Schools**

165.    Botetourt County Public Schools ("BCPS") has a documented pattern of responding inconsistently and discriminatorily when incidents involve individuals with disabilities, whether those individuals are students or employees. This pattern is reflected not only in the handling of Mr. Sherwood's matter but in other disability-related incidents within the same school community.

166.    In 2025, at James River High School, an autistic student was recorded on Snapchat while being mocked for his disability, followed by additional physical aggression, including peers throwing rocks at him (Ex. __). Although BCPS had video evidence and parental reporting, the student was never interviewed as part of the investigation. The students

78

responsible received only minimal discipline, and BCPS implemented no disability-informed measures to protect the student or ensure his participation in the investigative process.

167.    BCPS's failure to interview that disabled victim parallels its treatment of Mr. Sherwood, a disabled adult employee with documented cognitive and sensory-processing impairments. In Mr. Sherwood's case, BCPS and the Sheriff's Office treated him as presumptively guilty without interviewing him, reviewing available exculpatory video, or providing any accessible explanation of the allegations before taking punitive action.

168.    These incidents demonstrate that BCPS lacks basic disability-related investigative safeguards and denies disabled individuals equal participation in school-related grievance and safety procedures. This constitutes a failure to provide meaningful access to programs and investigative processes as required under the ADA and §504.

169.    The contrasting responses further show that disability-related investigative errors within Botetourt County are systemic. When the disabled individual is the victim, BCPS minimizes the incident and performs only a partial investigation. When the disabled individual is the accused, BCPS escalates immediately to disciplinary measures, outside reporting, and stigmatizing public communications without procedural safeguards. This differential treatment constitutes discrimination by reason of disability under 42 U.S.C. § 12132 and 29 U.S.C. § 794.

170.    The autistic-student incident, together with the Sherwood matter and other documented failures, demonstrates that Botetourt County lacks adequate policies, training, and supervision necessary to ensure disability-compliant investigations. The County's deliberate indifference to these deficiencies was a proximate cause of the ADA and §504 violations suffered by Plaintiffs.

**F. Discriminatory Treatment by Reason of Disability**

171.   Defendants failed to reasonably accommodate Mr. Sherwood's cognitive impairments during critical stages of the investigation and arrest, including:

(a) failing to ensure he understood the allegations prior to custodial detention;

(b) failing to provide accessible explanations of rights, charges, or conditions;

(c) exploiting his processing deficits by presenting incomplete or misleading information;

(d) withholding probable-cause documentation that a non-disabled individual could have tracked, challenged, or understood more effectively (Ex. ___; Ex. ____); and

(e) subjecting him to an unusually aggressive charging approach of twenty-five assault and-battery counts without evidentiary basis or procedural safeguards.

172.   Mr. Sherwood's disability directly contributed to Defendants' ability to leverage concealment, procedural irregularities, and technologically enabled information gaps in a manner that disproportionately harmed him compared to similarly situated non-disabled defendants.

173.   Defendants further discriminated by issuing a stigmatizing public press release portraying Mr. Sherwood as a danger and sexual threat to children while knowing he lacked the cognitive ability to respond or correct the record. (Ex. ___).

174.   Defendants also failed to adopt disability-accommodation policies for arrestees within BCSO, despite substantial investments in advanced law-enforcement technologies (digital dispatch, radio-tower expansion, data-link systems) without comparable investments in ADA-compliant protections (Ex. ___; Ex. ___; Ex. ___).

**G. Causation and Damages**

175.    As a direct and proximate result of this disability-based discriminatory treatment, Mr. Sherwood suffered severe reputational harm, emotional distress, economic loss, and denial of equal access to law-enforcement programs and protections.

176.    Mr. Sherwood is entitled to compensatory damages, attorneys' fees, and injunctive relief requiring the County to implement ADA-compliant arrest, investigation, and custodial procedures.

## COUNT VIII
## SECTION 504 OF THE REHABILITATION ACT
## DISABILITY DISCRIMINATION
## 29 U.S.C. § 794

(Against the County of Botetourt and Sheriff Matthew T. Ward in his official capacity)

**A. Incorporation of Prior Allegations**

177.   Plaintiffs reallege and incorporate by reference all preceding paragraphs.

**B. Legal Basis: Rehabilitation Act § 504**

172.   Section 504 prohibits any entity receiving federal financial assistance from discriminating against an otherwise qualified individual solely by reason of disability. 29 U.S.C. § 794(a).

173.    Botetourt County is the proper defendant under Section 504 because it is the legal recipient of federal public-safety, emergency-communications, and law-enforcement grant funding, and all departments and instrumentalities of the County, including the Botetourt County Sheriff's Office, constitute "programs or activities" within the meaning of 29 U.S.C. § 794(b).

174.    Sheriff Matthew T. Ward is the final operational policymaker for the County's law-enforcement and jail operations, and is responsible for implementing, supervising, and enforcing ADA/§ 504 compliance within those programs and activities, including arrest processing, custodial intake, emergency-communications integration, and access to accommodations for disabled detainees. Ward's conduct, and the conduct of deputies under his direction, therefore constitutes the County's conduct for purposes of Section 504 liability.

175.   To state a claim under § 504, a plaintiff must show:

(a) he is a qualified individual with a disability;

(b) he was excluded from participation in, denied the benefits of, or subjected to

82

discrimination under a federally funded program; and

(c) the discrimination occurred solely by reason of disability.

## C. Exclusion From and Unequal Access to County Law-Enforcement Programs

176.    Defendants' denial of basic procedural protections—including refusal to provide probable-cause documentation, withholding of exculpatory, *Brady*, and *Giglio* evidence, the creation of inconsistent dual JDR case entries, unequal charging practices, and the use of bond-revocation pressure that restricted Mr. Sherwood's ability to exercise his defense rights, constitutes exclusion from, denial of, or discrimination in the administration of a federally funded program.

177.    Defendants' failure to provide any disability-related accommodations during arrest, interrogation, custodial processing, or case-information access deprived Ray of meaningful participation in the law-enforcement system.

178.    Mr. Sherwood's cognitive impairments made him uniquely vulnerable to hidden dispatch transfers, digital case-management irregularities, and the Sheriff's Office's discretionary public-messaging practices, none of which Defendants modified or accommodated despite knowing his disability-related limitations. (Ex. ___).

## D. Discrimination Solely by Reason of Disability

179.    Mr. Sherwood's disability was the central reason Defendants' concealment and procedural deviations inflicted extraordinary harm. Defendants knowingly relied on his vulnerabilities to maintain leverage and escalate charges.

180.    Non-disabled comparators in Botetourt County routinely receive:

(a) probable-cause affidavits;

(b) accurate, non-duplicative case-record entries;

(c) lawful charging practices;

(d) non-stigmatizing public communications; and

(e) meaningful opportunity to participate in their own defense.

181.    Mr. Sherwood received none of these protections solely because of his disability and the County's failure to implement disability-inclusive procedures.

**E. Damages**

182.    Mr. Sherwood suffered economic loss, reputational damage, emotional distress, humiliation, and denial of equal protection under County law-enforcement programs due to Defendants' § 504 violations.

183.    Mr. Sherwood seeks compensatory damages, attorneys' fees, and appropriate injunctive and equitable relief.

## COUNT IX
## SECTION 504 OF THE REHABILITATION ACT
### 29 U.S.C. § 794

(Against the County of Botetourt and Botetourt County School Board)

### A. Incorporation of Prior Allegations

184.   Plaintiffs reallege and incorporate by reference all preceding paragraphs.

### B. Legal Basis:

185.    The Botetourt County School Board is a recipient of federal financial assistance and is subject to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

186.    Mr. Sherwood is an individual with a disability as defined by federal law. His VA disability records confirm that, at all relevant times, he suffered from service-connected conditions substantially limiting major life activities, and by September 2025 he had been rated 100 percent permanent and total.

187.    The School Board knew of Mr. Sherwood's disabilities. He disclosed them during his hiring process, he discussed them with his supervisors, and they were apparent during his daily work on a school bus.

### C. Discrimination and Retaliation

188.   Despite this knowledge, Defendants denied Mr. Sherwood the protections guaranteed by § 504 by failing to provide reasonable accommodations, failing to engage in the interactive process, and taking adverse employment actions without considering the impact on his known disabilities.

189.   Defendants further discriminated against Mr. Sherwood on the basis of disability by:

(a) suspending him without notice;

(b) banning him from school property;

(c) initiating termination without lawful authority; and

(d) publicly adopting and republishing stigmatizing and false law-enforcement statements—actions taken without legitimate, nondiscriminatory justification.

## D. Policy, Custom, or Practice (Monell-Equivalent Requirement)

190. The discriminatory acts described above were not isolated. They were undertaken pursuant to the School Board's and the County's policies, customs, or practices, including:

(a) a custom of allowing non-superintendent personnel to effectuate disciplinary or termination decisions outside of statutory authority;

(b) a policy or custom of deferring to Sheriff's Office communications and dispatch practices when making employment and safety decisions involving school employees, without safeguards for disability discrimination or retaliation;

(c) the County's practice of using its centralized dispatch, records, and public-safety communication systems in ways that publicly stigmatize individuals with disabilities, including by amplifying unverified accusations;

(d) the School Board's entrenched failure to train administrators and supervisors on ADA/§ 504 requirements, accommodations, and anti-retaliation protections; and

(e) a policy and custom of terminating employees within their appeal windows depriving them of a name-hearing clearing thereby violating a due process right.

191. These policies and customs were the moving force behind the violations of Mr. Sherwood's rights under § 504. Defendants acted intentionally, willfully, or with deliberate indifference to his federally protected rights.

**E. Damages**

192.    As a direct and proximate result of Defendants' violations of § 504, Mr. Sherwood suffered economic loss, reputational harm, emotional distress, humiliation, and denial of equal access to public programs and activities, including County law-enforcement and School Board processes.

193.    Mr. Sherwood seeks compensatory damages, attorneys' fees, and appropriate injunctive and equitable relief.

## COUNT X
## AMERICANS WITH DISABILITIES ACT (TITLE II)
## DISABILITY DISCRIMINATION
## 42 U.S.C. § 12132

(Against the County of Botetourt and Botetourt County School Board)

### A. Incorporation of Allegations

194.    Plaintiff Raymond L. Sherwood III realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

### B. Legal Basis:

195.    The County of Botetourt and the Botetourt County School Board are "public entities" within the meaning of 42 U.S.C. § 12131(1), and each operates programs, services, and activities subject to Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132.

196.    The School Board operates school-transportation employment, disciplinary, investigative, and grievance systems that constitute "services, programs, or activities" within Title II. The County operates law-enforcement, public-safety, and emergency-communications (dispatch) systems that function jointly with the School Board in managing school-safety events and employee status determinations. All are subject to Title II.

197.    Mr. Sherwood is an individual with a disability as defined by 42 U.S.C. § 12102, based on service-connected conditions that substantially limit major life activities. Defendants knew of his disabilities through disclosures during hiring, communications with supervisors, and daily observation.

### C. Discrimination Under Title II

198.    Defendants excluded Mr. Sherwood from participation in, denied him the benefits of, and subjected him to discrimination in public programs and activities—specifically his

88

employment, the disciplinary and grievance processes, and the County's law-enforcement/dispatch systems—because of his disability.

199.    Such discrimination included:

(a) suspending him without notice;

(b) banning him from school property;

(c) initiating termination without statutory authority;

(d) failing to provide reasonable accommodations or engage in any interactive process;

(e) relying on, coordinating with, or deferring to Sheriff's Office communications and dispatch practices that cast Mr. Sherwood as dangerous or criminal despite the absence of probable cause; and

(f) endorsing, adopting, or republishing stigmatizing and unverified law-enforcement statements that materially affected his employment status and public reputation.

200.    Defendants' conduct denied Mr. Sherwood meaningful access to the programs, services, and activities offered by both public entities and treated him differently than similarly situated nondisabled individuals.

**D. Policies, Customs, or Practices (Monell Requirement)**

201.    The Title II violations described above were undertaken pursuant to Defendants' policies, practices, or customs, including:

(a) a School Board custom of permitting non-superintendent personnel to impose suspensions, bans, or termination-related actions outside of statutory authority;

(b) a joint School Board–County practice of deferring to Sheriff's Office dispatch alerts, safety statements, and communications without ADA-compliant safeguards for neutrality, accuracy, or nondiscriminatory treatment;

89

(c) the County's practice of using its emergency-communications infrastructure in a manner that publicly stigmatizes individuals with disabilities by disseminating unverified or misleading safety information;

(d) the School Board's longstanding failure to train supervisors and administrators on ADA Title II obligations, disability accommodation, and anti-retaliation rules; and

(e) Defendants' shared failure to implement or enforce policies ensuring ADA-compliant handling of school-safety communications, personnel decisions, and public-facing statements involving individuals with disabilities.

202.    These policies, practices, and customs were the moving force behind the exclusion, discrimination, and stigmatization Mr. Sherwood experienced.

**E. Intent and Deliberate Indifference**

203.    Defendants acted intentionally or with deliberate indifference to Mr. Sherwood's federally protected rights by taking adverse actions despite knowledge of his disabilities and by maintaining policies that foreseeably caused disability-based discrimination.

**F. Damages**

204.    As a direct and proximate result of Defendants' violations of Title II, Mr. Sherwood suffered economic loss, reputational injury, emotional distress, humiliation, and denial of equal access to public programs and activities.

205.    Mr. Sherwood seeks compensatory damages to the extent permitted by law, as well as attorneys' fees, equitable relief, and appropriate injunctive relief.

**COUNT XI**
**MUNICIPAL LIABILITY (MONELL)**
**42 U.S.C. § 1983**

(Against Botetourt County and the Botetourt County School Board)

**A. Incorporation of Allegations**

206.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

**B. Nature of the Claim**

207.    The constitutional violations underlying this Count include (1) unlawful seizure and malicious prosecution in violation of the Fourth Amendment; (2) deprivation of liberty and property interests in reputation and employment without due process of law, in violation of the Fourteenth Amendment; and (3) interference with Plaintiffs' right to familial association and integrity, protected under the substantive component of the Fourteenth Amendment. Each of these deprivations resulted from a unified administrative custom of neglect, concealment, and procedural noncompliance that spanned multiple County agencies and instrumentalities—including the Botetourt County Sheriff's Office, Magistrate's Office, and the Botetourt County School Board—reflecting a coordinated failure of policy and oversight at the County level.

208.    In addition, these constitutional injuries arose, in part, from the County's longstanding customs and practices within the Botetourt County Sheriff's Office—including misuse of the County's dispatch infrastructure, failure to implement ADA-required protocols during law-enforcement interactions, and the County's policy of deferring to unverified accusations by County-connected employees. These customs constitute County policy for Monell purposes because the Sheriff's Office functions as a County law-enforcement arm funded, supervised, and technologically integrated through County systems.

91

209. The Fourteenth Amendment also protects the Sherwood family's right to familial integrity and association from unwarranted state interference. See *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) ("The fundamental liberty interest of natural parents in the care, custody, and management of their child is protected by the Fourteenth Amendment."); *Hodge v. Jones*, 31 F.3d 157, 163–64 (4th Cir. 1994) (recognizing that governmental actions which stigmatize or otherwise interfere with the parent-child relationship implicate substantive due-process protections); *Jordan v. Jackson*, 15 F.3d 333, 342–43 (4th Cir. 1994). The retaliatory publication of stigmatizing allegations, together with the coordinated administrative actions that jeopardized the Sherwood's employment, reputation, and their daughters' school environment, foreseeably and unjustifiably impaired the family's associational integrity, constituting a further constitutional deprivation under *Monell*.

210. Collectively, these interrelated deprivations—spanning unlawful seizure, reputational and employment harm, and interference with familial association—were not isolated mistakes by individual actors but the foreseeable result of overlapping County and School Board customs of concealment, administrative neglect, and retaliatory coordination. The same systemic deficiencies that enabled unsworn criminal charging practices also permeated the County's and School Board's recordkeeping and communication systems—including the Sheriff's Office's failure to transmit sworn warrants and the Juvenile & Domestic Relations Court Clerk's failure to maintain accurate and complete case files. Those failures were exemplified by the November 3 and November 7, 2025 certifications of the *Commonwealth v. Sherwood* JDR file, in which the later "complete" version included new student-disciplinary records not present in the earlier certified file and not previously identified as missing. These irregularities underscore the procedural breakdowns and evidentiary instability detailed below.

92

211.    These interagency deficiencies demonstrate that Botetourt County's and the Botetourt County School Board's failures were not mere clerical oversights but manifestations of institutionalized neglect and deliberate indifference to statutory and constitutional duties. Their parallel breakdowns in record management, communication, and judicial documentation reflect a coordinated custom of concealment and procedural evasion sufficient to constitute an official policy under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

212.    Accordingly, the following sections set forth specific policies, customs, and failures of oversight by Botetourt County, acting through the Sheriff's Office and its administrative arms, and by the Botetourt County School Board, that jointly and severally operated as the moving forces behind Plaintiffs' constitutional injuries. These policies also drew upon the recordkeeping and procedural failures of other County-level instrumentalities involved in criminal and juvenile processing, further evidencing a coordinated breakdown of constitutional compliance at the local-government level.

**C. Monell Liability – Botetourt County (Sheriff's Office)**

*1. Policy of Unlawful Seizure / Malicious Prosecution (Fourth Amendment)*

213.    Sheriff Matthew T. Ward, acting as the County's final policymaker for law enforcement, implemented and ratified a policy of initiating criminal process without sworn probable-cause affidavits, in direct violation of Va. Code § 19.2-72 and the Fourth Amendment.

214.    On May 2, 2025, Kevin Hix, under Ward's supervision, sought twenty-five arrest warrants against Mr. Sherwood. The JDR Clerk later certified that no sworn statement, affidavit, or recorded oath supported those warrants (Ex. V).

215.    Between July and September 2025, defense counsel Joseph Cockfield made four written requests to the Commonwealth's Attorney's Office seeking the sworn probable-cause

affidavits underlying the twenty-five warrants, as well as related exculpatory and court-ordered materials. (Ex. H). Neither Assistant Commonwealth's Attorney Marshall Lukacs nor Commonwealth's Attorney John Alexander ever responded. Their silence, despite repeated formal inquiries, demonstrates that County law-enforcement and prosecutorial officials were aware that no sworn probable-cause documentation existed, yet continued to pursue and publicly defend the unwarranted charges.

216.    This concealment was later independently confirmed by the Office of the Executive Secretary of the Supreme Court of Virginia, which stated in a November 13, 2025 written communication that none of the twenty-five warrants "were accompanied by any probable-cause documentation." (Ex. Y). This statewide administrative confirmation establishes that the absence of sworn probable-cause materials was not an isolated clerical error but a systemic failure involving the Sheriff's Office, the Magistrate's Office, and prosecutorial authorities. This systemic defect, known and uncorrected, constitutes a policy or custom under Monell.

217.    Sheriff Ward, despite having ultimate supervisory and policymaking authority over the deputies involved, took no corrective or disciplinary action after learning that warrants were issued without sworn probable-cause statements, thereby ratifying the unconstitutional practice through deliberate inaction and permitting it to continue as an accepted policy of the Sheriff's Office.

218.    This ratification by omission constitutes a "single-decision" policy by a final policymaker under *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), making the Sheriff's Office—and thus Botetourt County—the moving force behind the Fourth Amendment violation.

94

219.    Sheriff Ward's failure to ensure compliance with Va. Code § 19.2-72 and the constitutional oath requirement demonstrates deliberate indifference to the rights of those subject to arrest. *Peal v. Commonwealth*, 26 Va. App. 44 (1997) (holding that sworn oath and written complaint are jurisdictional prerequisites to a valid warrant).

220.    As a Commissioner of the Virginia Law Enforcement Professional Standards Commission, Ward possessed specialized knowledge of constitutional warrant standards yet failed to implement training, supervision, or audit mechanisms to prevent his deputies from obtaining unsworn warrants.

221.    This omission and failure to train constitute deliberate indifference to the obvious risk that officers would initiate criminal process without probable cause, foreseeably resulting in unlawful seizures such as Mr. Sherwood's. *City of Canton v. Harris*, 489 U.S. 378 (1989).

222.    Beyond the warrant-issuance practices described above, Defendant Botetourt County, acting through Sheriff Ward, maintained a continuing pattern of administrative obstruction, technological interference, and record-keeping irregularities that demonstrate a County-wide custom of suppressing oversight.

223.    Jarvis's statements, later verified through counsel's contemporaneous transcript, corroborate the systemic breakdown in mandatory filings she had previously certified in writing. Her acknowledgement that the JDR Court "no longer gets the affidavits" required to establish probable cause directly aligns with the Office of the Executive Secretary's November 13, 2025 confirmation that none of the twenty-five warrants carried any sworn probable-cause documentation. (Exs. V, Y, CC–DD). Taken together, these independent confirmations establish a multi-agency practice—not an isolated lapse—in which the Sheriff's Office, Magistrate's

95

Office, and Clerk's Office uniformly failed to ensure the existence, transmission, or preservation of the sworn probable-cause record required by Va. Code § 19.2-72 and the Fourth Amendment.

224.    On November 3, 2025, counsel's preservation letters to Commonwealth's Attorney John Alexander and Assistant Commonwealth's Attorney Marshall Lukacs were rejected by the Office's spam filter (Ex. JJ), and on November 12, 2025, counsel's FOIA correspondence to Botetourt County and the Sheriff's Office was similarly rejected by the County's filtering system (Exs. NN). These cross-agency failures occurring immediately after issuance of preservation and FOIA demands illustrate a systemic breakdown in transparency (Ex. OO).

225.    This obstruction parallels statements captured in an audio recording lawfully obtained under Virginia's one-party-consent statute, in which Deputy Clerk Pamela Jarvis confirmed that the Juvenile & Domestic Relations Court had "not been receiving arrest warrants or petitions for juvenile cases for a while," and further acknowledged that the court "no longer get[s] the affidavits, which tell why they're being charged." (CC–DD) These statements demonstrate that, for an extended period, the Clerk's Office has not been receiving or maintaining the sworn probable-cause materials required by law to initiate or validate criminal process, in violation of Va. Code § 19.2-72, § 16.1-260(A), and Rule 3A:3(a) of the Rules of the Supreme Court of Virginia.

226.    The absence of such sworn filings also implicates the Fourth Amendment's requirement that warrants issue only upon probable cause supported by oath or affirmation. Collectively, these omissions reveal a systemic procedural breakdown in the transmission and preservation of constitutionally essential judicial records, evidencing an institutionalized failure

96

to comply with mandatory filing duties and reflecting policy-level indifference rather than isolated error.

227.    These persistent procedural deficiencies are not isolated clerical oversights but manifestations of an entrenched administrative policy—a pattern of neglect and concealment so pervasive that it has become an accepted practice within the County's justice system. The resulting absence of sworn probable-cause records strikes at the heart of both Virginia's statutory safeguards and the Fourth Amendment's constitutional protections, precisely the type of institutional failure courts have repeatedly held sufficient to establish *Monell* liability.

228.    These acts collectively establish a custom and practice of administrative interference, concealment, and systemic obstruction within Botetourt County's interconnected law-enforcement and prosecutorial offices, constituting deliberate indifference to constitutional and statutory duties and supporting municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

Federal courts have repeatedly recognized that institutional concealment, record suppression, and administrative obstruction can establish a municipal custom or policy under *Monell*. *See, e.g.*,

***Burgess v. Goldstein***, **997 F.3d 541, 552–54 (4th Cir. 2021)** (holding municipality liable where police and prosecutors maintained "a longstanding practice of concealing or destroying exculpatory evidence," constituting a *Monell* custom of evidence suppression);

***Owens v. Baltimore City State's Attorney's Office***, **767 F.3d 379, 403–05 (4th Cir. 2014)** (reversing dismissal of *Monell* claim based on a "persistent pattern of suppression and concealment of exculpatory and impeachment evidence" in official records; municipal liability arises from "repeated failures to disclose");

97

*Carter v. Morris*, **164 F.3d 215, 218–19 (4th Cir. 1999)** (noting that widespread administrative failures to train and supervise, or deliberate indifference to repeated constitutional violations, can evidence a policy or custom for *Monell* purposes);

*Jones v. City of Chicago*, **856 F.2d 985, 994–95 (7th Cir. 1988)** (holding municipality liable where law enforcement and prosecutors engaged in "systematic concealment and manipulation of evidence" and maintained a "custom of covering up constitutional violations"); and

*Beck v. City of Pittsburgh*, **89 F.3d 966, 971–73 (3d Cir. 1996)** (finding *Monell* liability where a pattern of ignored complaints and record-keeping failures evidenced deliberate indifference by policymakers).

*3. Policy of Stigma-Plus Defamation (Fourteenth Amendment)*

229.    Sheriff Ward also established and ratified a custom of public stigmatization through official press releases.

230.    On May 6 and May 7, 2025, the Sheriff's Office issued and defended public statements implying sexual misconduct and moral depravity by Mr. Sherwood, despite no probable cause and prior to any adjudication. (Exs. E–F)

231.    This extrajudicial communication was part of a long-standing custom of retaliatory public disclosure, intended to punish, not inform—a practice condemned in *Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987).

**D. Monell Liability – Botetourt County School Board**

*1. Policy of Procedural Due-Process Violation (Fourteenth Amendment)*

232.    The Botetourt County School Board, acting through Superintendent and Human Resources Director Timothy A. McClung, adopted and implemented an official policy of

98

terminating employees based solely on law-enforcement allegations, without providing constitutionally adequate process.

233.   On May 8, 2025, the School Board voted to ratify McClung's recommendation to terminate Mr. Sherwood (Ex. A–C) while his ten-day grievance period was still open and without offering any name-clearing hearing or opportunity to contest the stigmatizing charges.

234.   This single act by the Board, its final policymaking body for personnel actions, constitutes official policy under *Codd v. Velger*, 429 U.S. 624 (1977), and *Starbuck*, 28 F.4th at 534.

*2. Custom of Deference to Law Enforcement*

235.   The School Board maintained a widespread custom of rubber-stamping law-enforcement accusations as grounds for termination.

236.   By adopting the Sheriff's defamatory narrative without independent review or factual verification, the Board institutionalized a policy of automatic deference that replaced due process with presumption of guilt.

237.   This unconstitutional custom was the moving force behind both (a) the loss of Mr. Sherwood's employment and (b) the continued dissemination of false and stigmatizing information, constituting a Fourteenth Amendment stigma-plus deprivation.

238.   The School Board's failure to respond to Mrs. Sherwood's May 2025 written notice of harm and student-safety concern (Ex. G), further demonstrates deliberate indifference to procedural fairness and Title IX-related obligations.

239.   This institutional disregard reinforced the coordinated retaliatory climate and contributed to Plaintiffs' continuing deprivation of protected liberty and property interests.

**E. Resulting Constitutional Deprivations**

240.    As a direct and foreseeable result of the policies, customs, and ratifications described above, Plaintiffs suffered:

    a.  Unlawful seizure and malicious prosecution without probable cause (Fourth Amendment);

    b.  Deprivation of liberty and property interests in reputation and employment without due process (Fourteenth Amendment – stigma-plus and procedural due process); and

    c.  Continuing reputational injury and economic loss caused by coordinated County and School Board action.

    d.  Each policy or custom was the moving force behind the constitutional injuries suffered by Plaintiffs. *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397 (1997).

241.    WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against Defendants Botetourt County and the Botetourt County School Board, jointly and severally, for:

    a.  Compensatory damages for constitutional injuries and resulting harm;

    b.  Punitive damages where permitted by law;

    c.  Attorneys' fees and costs under 42 U.S.C. § 1988; and

    d.  Such further relief as the Court deems just and proper.

242.    Plaintiffs further seek all equitable and declaratory relief the Court deems necessary to prevent continuing violations of their constitutional rights and to ensure preservation of official records relevant to this action.

**COUNT XII**
**TITLE IX RETALIATION**
**AND**
**SEX-BASED DISCRIMINATION**
**20 U.S.C. § 1681**

(Against the Botetourt County School Board and Timothy A. McClung)

**A. Incorporation of Allegations**

243.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

**B. Nature of the Claim**

244.    This Count is brought under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., prohibiting discrimination on the basis of sex in any education program or activity receiving Federal financial assistance.

245.    Defendant Botetourt County School Board receives federal financial assistance within the meaning of Title IX.

246.    Defendant Timothy A. McClung, as Human Resources Director and superintendent designee, possessed authority to effect employment actions and to respond to Title IX complaints, acting as an agent of the Board.

247.    Plaintiffs assert claims for retaliation and sex-based disparate treatment arising from the Board's deliberate indifference to harassment and its retaliatory termination and public stigmatization of Mr. Sherwood following protected activity.

**C. Legal Standard**

248.    Title IX forbids both direct discrimination "on the basis of sex" and retaliation against individuals who complain of such discrimination. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005).

101

249.    A Title IX retaliation claim requires: (1) protected activity; (2) an adverse action by the recipient; and (3) a causal connection between the two. *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 263 (4th Cir. 2021).

250.    A school board is liable for deliberate indifference to known acts of discrimination or retaliation by its officials. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998); *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).

**D. Factual Basis**

*1. Protected Activity and Notice of Harassment*

251.    In her May 7, 2025 email to school administrators, Lauren R. Sherwood notified them that one daughter would complete schoolwork virtually for mental-health and safety reasons and that another would attend school only for her final lacrosse game, with the expectation that her safety and well-being would be monitored throughout the day. (Ex. G).

252.    This written communication placed the School Board and McClung on actual notice that the Sherwood daughters were experiencing stigma and potential hostility tied to sex-based allegations made public by county officials.

253.    The message also constituted protected activity under Title IX, as it opposed gender-based stereotyping and harassment flowing from the County's portrayal of Mr. Sherwood's alleged "inappropriate contact" with female students. *Jackson*, 544 U.S. at 179.

*2. Deliberate Indifference and Adverse Action*

254.    Despite receiving the May 7 notice, neither McClung nor any Title IX coordinator investigated, acknowledged, or responded. No safety plan or communication was issued to Mrs. Sherwood, violating the Board's own Title IX policy requiring prompt, impartial investigation of reported discrimination.

102

255.    This total non-response constitutes deliberate indifference, satisfying *Davis*, 526 U.S. at 650, because officials with authority to institute corrective measures refused to act.

256.    Within days of this protected activity, McClung and the Board ratified the termination of Mr. Sherwood (Ex. A–C) and publicly reaffirmed the gendered accusations that triggered Mrs. Sherwood's complaint. Such retaliatory escalation constitutes a materially adverse action under *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

*3. Sex-Based Discrimination and Stereotyping*

257.    The Board's and McClung's actions were infected by gender-based stereotypes that a male bus driver interacting with female students was inherently suspect—a form of sex discrimination recognized in *Doe v. Fairfax Cnty.*, 1 F.4th at 270.

258.    References in termination documents to Mr. Sherwood's "unprofessionalism when it comes to female students" demonstrate sex-specific enforcement untethered to evidence of misconduct.

259.    The Board's and McClung's refusal to provide a name-clearing hearing, while publicly endorsing that narrative, amplified the sex-based bias and foreclosed Mr. Sherwood's future in education.

260.    Subsequent certified-file correspondence and FOIA communications confirmed that the Commonwealth's Attorney's Office ignored four separate written requests from defense counsel sent July 18, August 7, August 26, and September 15, 2025 seeking the sworn probable-cause affidavits for all twenty-five charges. (Ex. H). On November 13, 2025, the Office of the Executive Secretary of the Supreme Court of Virginia further confirmed in writing that none of the warrants "were accompanied by any probable-cause documentation." (Ex. Y). Despite this absence of any lawful factual predicate, the School Board and McClung adopted and publicly

103

amplified the gendered allegations against Mr. Sherwood, relying on law-enforcement narratives they neither verified nor investigated. Their decision to terminate Mr. Sherwood on the basis of unsupported accusations and to disregard Mrs. Sherwood's Title IX complaint constitutes sex-based stereotyping and deliberate indifference under *Jackson* and *Davis*.

*4. Causation and Knowledge*

261.    Defendants had actual knowledge of the harassment and of Mrs. Sherwood's written complaint (Ex. G). Their decision to ignore it—and to proceed with termination and public commentary—was causally connected to the protected activity and the gendered content of the allegations.

262.    The Board's and McClung's deliberate indifference permitted continued harassment of Savannah Beckner, B.M.B., and H.M.B., depriving them of equal educational access and benefits under Title IX.

**E. Resulting Injury**

263.    As a direct and proximate result of Defendants' conduct, the Sherwood family suffered significant injury, including the loss of Mr. Sherwood's employment and income, severe emotional distress and humiliation, reputational harm throughout the community, and the deprivation of educational opportunities and a safe learning environment for Savannah Beckner, B.M.B., and H.M.B. The continuing stigma has caused ongoing social isolation and impairment of the family's ability to participate fully in school and community life.

**F. Relief Requested**

264.    Plaintiffs therefore request that judgment be entered in their favor and against Botetourt County School Board and Timothy A. McClung, jointly and severally, awarding compensatory damages for emotional, reputational, and educational harm, punitive damages

where permitted by law, and such injunctive and equitable relief as may be necessary to ensure

Title IX compliance—including corrective training, adoption of remedial complaint-handling

procedures, and written acknowledgment of Mrs. Sherwood's May 7 complaint—together with

attorneys' fees and costs under 42 U.S.C. § 1988 and 20 U.S.C. § 1681 et seq., and such further

relief as the Court deems just and proper.

## COUNT XIII
### VIOLATION OF RIGHT TO FAMILIAL ASSOCIATION
### FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS
### 42 U.S.C. § 1983

(Against Defendants Kevin Hix, Matthew Ward, William Bentley, Marshall Lukacs, and John Alexander in their individual capacities; and against Botetourt County and the Botetourt County School Board as municipal entities under Monell)

## A. Incorporation of Allegations

265.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

## B. Nature of the Claim

266.    This Count is brought under 42 U.S.C. § 1983 for violations of the Sherwood family's fundamental right to familial association, integrity, companionship, and emotional security, protected by the Substantive Due Process Clause of the Fourteenth Amendment.

## C. Factual Basis — Interference With the Sherwood Family Unit, Including the Three Daughters

267.    Defendants, acting under color of state law, engaged in a coordinated course of conduct that foreseeably and directly destroyed the Sherwood family's emotional, social, and relational integrity. By fabricating criminal charges without probable cause, publishing stigmatizing accusations of sexual misconduct, and orchestrating the termination of Mr. Sherwood's employment, Defendants disrupted not only Mr. Sherwood's life but the lives of his wife, Lauren Sherwood, and three daughters: Savannah Beckner, B.M.B., and H.M.B.

268.    Defendants knew or should have known that their actions would foreseeably inflict significant emotional and psychological harm upon the three Sherwood daughters, who were all students in the same small community in which the accusations were publicized. The

106

children experienced stigma, social isolation, fear for their father's safety, and hostility within the school environment.

269.    On May 7, 2025, Mrs. Sherwood emailed school administrators (Ex. G) stating that the family's daughters were experiencing harm as a result of the public accusations and requesting safety-related accommodations. One daughter was forced to complete schoolwork virtually due to anxiety and fear of harassment, while another could only attend school for her final lacrosse game under supervision to ensure her safety. No official responded.

270.    The complete and deliberate silence from the School Board, Superintendent's designee, and Title IX officials—despite actual notice—demonstrates deliberate indifference to the Sherwood daughters' safety, emotional wellbeing, and educational environment.

271.    Defendants Ward, Hix, Bentley, Lukacs, and Alexander each participated in initiating, amplifying, or sustaining a false public narrative that portrayed Mr. Sherwood as a sexual predator, which foreseeably stigmatized his daughters by association. As a result, Savannah, B.M.B., and H.M.B. were subjected to ostracism, gossip, and hostility in their school community.

272.    Defendant McClung and the Botetourt County School Board further compounded the harm by publicly ratifying the termination of Mr. Sherwood while adopting and disseminating the same false accusations, thereby reinforcing a hostile environment for the three daughters within the school system.

273.    The devastating impact of Defendants' actions on the three children was intensified when defense counsel's repeated requests for the sworn probable-cause affidavits supporting the 25 warrants (sent July 18, August 7, August 26, and September 15, 2025) went unanswered (Ex. H), and when on November 13, 2025 the Office of the Executive Secretary

107

confirmed that none of the warrants were supported by any probable-cause documentation (Ex.

Y). This revealed that the accusations tearing apart their family had no lawful factual basis.

## D. Constitutional Basis

274. The baseless and stigmatizing charges publicized by Defendants created a predictable and severe disruption to the children's ability to attend school, participate in activities, feel safe in their community, or maintain stable emotional development.

275. The right of parents and children to maintain their family integrity and companionship free from unwarranted government interference is a fundamental liberty interest protected by the Fourteenth Amendment. *Santosky v. Kramer*, 455 U.S. 745 (1982); *Troxel v. Granville*, 530 U.S. 57 (2000). Government actions that "shock the conscience" or deliberately disrupt family unity violate substantive due process. *Jordan by Jordan v. Jackson*, 15 F.3d 333, 342 (4th Cir. 1994*); Hodge v. Jones*, 31 F.3d 157, 163–64 (4th Cir. 1994).

276. Defendants' conduct—including fabricating criminal charges, suppressing exculpatory evidence, publicizing false accusations of sexual misconduct, and failing to protect the Sherwood daughters from foreseeable harassment—meets and exceeds this standard.

## E. Injury to the Three Sherwood Daughters

277. As a direct and proximate result of Defendants' conduct, Mr. and Mrs. Sherwood, Savannah Beckner, B.M.B., and H.M.B. suffered:

    a.  Loss of familial companionship and emotional security;

    b.  Severe emotional distress, anxiety, and trauma from seeing their stepfather publicly labeled as a sexual predator;

    c.  Educational disruption, including forced virtual learning and restricted participation in school activities;

108

d. Social isolation and reputational stigma within their own school community;

e.  Fear of retaliation and hostility, causing ongoing emotional and psychological harm.

278.    These harms constitute independent Fourteenth Amendment injuries suffered by the children and are compensable under § 1983.

## F. Malice, Recklessness, and Liability

279.    Defendants' actions were intentional, malicious, and in reckless disregard for the Sherwood family's fundamental rights. Accordingly, they are liable jointly and severally for all resulting harms to Mr. Sherwood, Mrs. Sherwood, and the three Sherwood daughters.

## G. Relief Requested

280.    Plaintiffs seek compensatory and punitive damages, declaratory and injunctive relief protecting their familial integrity from further interference, and attorneys' fees and costs under 42 U.S.C. § 1988, together with any other relief this Court deems just and proper.

## COUNT XIV – VIRGINIA CIVIL CONSPIRACY
### (Va. Code §§ 18.2-499 and 18.2-500)

(Against Defendants Thomas, Kevin Hix, Matthew Ward, William Bentley, Marshall Lukacs, and John Alexander, in their individual capacities.

### A. Incorporation of Allegations

281. Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

### B. Nature of the Claim

282. This Count is brought pursuant to Va. Code §§ 18.2-499 and 18.2-500 and Virginia common law for civil conspiracy to willfully and maliciously injure Plaintiff Raymond L. Sherwood III in his reputation, trade, business, and profession.

### C. Factual Basis for Conspiracy

283. At all relevant times, Defendants Matthew Ward, Kevin Hix, William Bentley, John Alexander, Marshall Lukacs, and Kasey Thomas (collectively, the "Conspirators") knowingly, intentionally, and maliciously combined, associated, agreed, and mutually undertook a concerted course of conduct to remove Mr. Sherwood from his employment, destroy his reputation, and subject him to criminal process without lawful probable cause.

284. The conspiracy was advanced through a coordinated series of overt acts, including but not limited to:

1. **Directing and sustaining a twenty-five count charging decision** despite knowing there was no sworn affidavit, no oath-based statement, and no probable cause documentation of any kind, resulting in void ab initio warrants issued in violation of Va. Code § 19.2-72.

2. **Issuing and amplifying stigmatizing press releases and media statements** (Exs. E–F, FF–GG) framing Mr. Sherwood as a sexual threat or moral danger while knowing no

intimate touching was alleged and no Title IX or internal investigation had ever substantiated such claims.

3. **Coordinating the timing of defamatory public statements** with the School Board's termination actions (Exs. A–C), ensuring that the criminal narrative and employment action reinforced each other to maximize reputational destruction.

4. **Misusing criminal process to coerce and intimidate**, including suppressing exculpatory evidence, resisting or ignoring lawful discovery requests (Ex. H), and making statements designed to threaten bond status or pressure Mr. Sherwood into resolutions unsupported by evidence (Exs. J, Q, T).

5. **Between July and September 2025**, defense counsel Joseph "Joe" Cockfield submitted four separate written requests seeking the sworn probable-cause affidavits, student-discipline records, and other court-ordered materials (Ex. H). None of the Conspirators produced any probable-cause documentation or even acknowledged its absence, despite actual knowledge that no oath or affirmation existed for any charge.

6. **On November 13, 2025**, the Office of the Executive Secretary of the Supreme Court of Virginia independently confirmed that none of the twenty-five warrants "were accompanied by any probable-cause documentation" (Ex. Y). This statewide confirmation proves that Defendants advanced, maintained, and publicized a criminal narrative they knew—or consciously avoided confirming—was unsupported by any lawful factual predicate.

7. **These revelations align with the recorded statements of JDR Deputy Clerk Pamela Jarvis**, who explained that the court "had not been receiving arrest warrants or petitions for juvenile cases for a while" and that the court no longer received sworn affidavits

explaining "why they're being charged" (Exs. DD–EE). Taken together, these facts demonstrate that Defendants' coordinated charging, public stigmatization, and termination efforts were not the product of mistake or administrative error, but of a joint and malicious scheme to inflict reputational, professional, and economic harm on Mr. Sherwood through knowingly defective criminal process.

**D. Predicate Unlawful Act and Injury**

285. The Conspirators' actions constitute a civil conspiracy because they willfully and maliciously injured Plaintiff in his reputation, trade, business, and profession by committing the underlying unlawful acts of malicious prosecution and defamation, including defamation per se and defamation by implication where their statements encouraged the public to infer sexual misconduct that never occurred and for which no lawful basis existed.

286. As a direct and proximate result of the conspiracy, Plaintiff suffered injury to his reputation, trade, business, and profession, including loss of employment, diminished earning capacity, severe emotional distress, and long-term reputational damage.

**E. Relief Requested**

287. WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against the Conspirators, jointly and severally, for:

a. Compensatory damages for all injuries sustained;

b. Treble damages pursuant to Va. Code § 18.2-500;

c. Attorneys' fees and costs pursuant to Va. Code § 18.2-500 and 42 U.S.C. § 1988;

d. Such further relief as this Court deems just and proper.

**COUNT XV – WRONGFUL TERMINATION (BOWMAN CLAIM)**
(Against the Botetourt County School Board)

### A. Incorporation of Allegations

288.    Plaintiffs reallege and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

### B. Nature of the Claim

289.    This Count is brought against Defendant Botetourt County School Board pursuant to Virginia common law for wrongful termination in violation of the public policy exception recognized in *Bowman v. State Bank of Keysville*, 229 Va. 534 (1985).

### C. Public Policy Violation

290.    Plaintiff was terminated from his employment as a school bus driver by the School Board on May 8, 2025 (Exs. A–C). This termination violated Virginia public policy by being based on the false imputation of criminal conduct.

### D.  False Imputation of Criminal Conduct

291.    The School Board's termination decision was based on the false and malicious imputation that Plaintiff had engaged in criminal conduct involving moral turpitude, specifically the implication of sexual misconduct toward minors.

292.    The Sheriff's Office press release and subsequent media statement from May 6-7 (Exs. E–F), issued immediately prior to and in conjunction with the termination, gratuitously referenced the sexual battery statute, falsely casting Plaintiff as a suspected sexual offender.

293.    The School Board's Human Resources Director, Timothy McClung, incorporated this defamatory narrative by citing "unprofessionalism when it comes to [his] interaction with female students on the bus" (Exs. A–B) as the basis for termination.

113

294.   The termination was executed despite the fact that no sexual charges were ever filed, the underlying warrants were *void ab initio*, and the criminal matter ultimately resulted in a deferred disposition without any finding of guilt.

295.   Subsequent certified-file correspondence and FOIA communications confirmed that the underlying warrants on which the School Board relied were unsupported by any sworn probable-cause statement. Defense counsel Joseph Cockfield submitted four written requests on July 18, August 7, August 26, and September 15, 2025 seeking the probable-cause affidavits for all twenty-five charges, and none were ever produced. (Ex. H).

296.   On November 13, 2025, the Office of the Executive Secretary of the Supreme Court of Virginia confirmed in writing that none of the warrants "were accompanied by any probable-cause documentation." (Ex. Y). Despite the complete absence of any lawful factual predicate for the charges, the School Board adopted and acted upon the defamatory narrative as if the allegations were substantiated, terminating Mr. Sherwood in direct violation of Virginia public policy against discharging an employee based on a false imputation of criminal conduct.

**Violation of Public Policy**

297.   Virginia public policy, as established in common law, prohibits an employer from discharging an at-will employee based on a false imputation of criminal conduct, particularly a crime involving moral turpitude.

298.   The School Board's action was driven by the initial, highly stigmatizing, and false public narrative created by the coordinated actions of the Botetourt County Sheriff's Office and Commonwealth's Attorney's Office and the School Board, rather than a legitimate, non-pretextual finding of cause related to job performance.

114

**Damages and Relief**

299.    As a direct and proximate result of the School Board's wrongful termination, Plaintiff suffered lost wages, loss of future earning capacity, severe emotional distress, and reputational harm.

300.    WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor and against Defendant Botetourt County School Board for compensatory and punitive damages in an amount to be determined at trial, together with pre- and post-judgment interest, attorneys' fees, costs, and such further relief as the Court deems just and proper.

## COUNT XVI – ABUSE OF PROCESS

(Against Defendants Marshall Lukacs, John Alexander, Matthew Ward, and Kevin Hix, in their individual capacities)

### A. Incorporation of Allegations

301.    Plaintiff Raymond L. Sherwood III realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

### B. Nature of the Claim

302.    This Count is brought against Defendants Marshall Lukacs, John Alexander, Matthew Ward, and Kevin Hix (the "Process Defendants") for common law abuse of process.

### C. Factual Basis for Abuse of Process

303.    The Process Defendants misused the criminal process, specifically the twenty-five arrest warrants (Ex. D), officializing a press release from the Sheriff's Office (Exs. E-F), the bond conditions, and the subsequent motion practice, for an ulterior purpose not proper in the regular prosecution of the proceedings (Exs. J, Q). The Sheriff's Office press release was not a neutral public-safety communication but a deliberate instrument of the criminal process itself. Rather than merely reporting an arrest, the release framed Mr. Sherwood as engaging in quasi-sexual "inappropriate contact" with minors, invoked sexual-battery language, and omitted exculpatory context—despite the absence of any sworn probable-cause affidavit supporting the warrants. By publicly disseminating a stigmatizing criminal narrative grounded in void process, Defendants weaponized the press release to exert coercive pressure, inflame public suspicion, and increase the likelihood of judicial and plea leverage. This use of public communication to advance a prosecutorial objective rather than perform a legitimate administrative function constitutes an improper, ulterior purpose and falls squarely within Virginia's doctrine of abuse of process.

116

**D. Ulterior Purpose**

304.    Process Defendants' ulterior purpose was to coerce Plaintiff into accepting a plea agreement, punish him for asserting his constitutional rights, destroy his reputation, and justify the School Board's termination decision, rather than to secure a conviction based on a lawful finding of probable cause.

**E. Improper Act in Use of Process**

305.    The improper acts in the use of the process include:

1.  Filing twenty-five warrants known to be *void ab initio* (Ex. V, Y) to maximize public humiliation and leverage;

2.  Assistant Commonwealth's Attorney Lukacs's filing of a motion to revoke bond and leveraging the threat of incarceration to pressure Plaintiff into a plea agreement (Exs. J, Q); and

3.  Publicizing a defamatory and sexually suggestive press release to amplify the coercive effect of the criminal charges and exert improper leverage through public stigma. (Exs. E-F).

306.    Defense counsel Joseph Cockfield submitted four written requests on July 18, August 7, August 26, and September 15, 2025 seeking the sworn probable-cause affidavits for all twenty-five warrants, and none were ever produced. (Ex. H).

307.    On November 13, 2025, the Office of the Executive Secretary of the Supreme Court of Virginia confirmed in writing that none of the warrants "were accompanied by any probable-cause documentation." (Ex. Y).

308.    Despite this knowledge, the Process Defendants continued using the defective warrants, bond proceedings, and public statements as instruments of coercion and reputational destruction. Their continued use of criminal process after learning it was unsupported by any sworn factual predicate constitutes a quintessential improper use of process under Virginia law.

117

309.    These acts constitute a misuse of the criminal process for a collateral, improper purpose, satisfying the requirements for abuse of process under Virginia law.

310.    As a direct and proximate result of the Process Defendants' abuse of process, Plaintiff suffered loss of liberty, humiliation, emotional distress, reputational injury, and substantial financial harm.

311.    WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor and against the Process Defendants, jointly and severally, for compensatory and punitive damages in an amount to be determined at trial, together with pre- and post-judgment interest, attorneys' fees, costs, and such further relief as the Court deems just and proper.

## COUNT XVII
## DEFAMATION PER SE AND BY IMPLICATION

(Against Defendant Kasey Thomas in her individual capacity)

### A. Incorporation of Allegations

312.   Plaintiff Raymond L. Sherwood III realleges and incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

### B. Nature of the Claim

313.   This Count is brought under Virginia common law for defamation per se and defamation by implication arising from false allegations made by Defendant Kasey Thomas that imputed criminal sexual misconduct and moral depravity to Plaintiff, which were later adopted and republished by law-enforcement and prosecutorial officials.

### C. Factual Basis

314.   Defendant Thomas falsely reported that Plaintiff had inappropriately touched minor students on his bus, knowing the conduct did not occur and that video evidence contradicted her claims.

315.   Thomas used her status as a probation officer and former law-enforcement officer to lend credibility to her allegations and to induce Defendants Marshall Lukacs, Matthew Ward, and Kevin Hix to initiate criminal charges without probable cause. See *West v. Atkins*, 487 U.S. 42 (1988); *Pickrel v. City of Springfield*, 45 F.3d 1115, 1118 (7th Cir. 1995).

316.   Her false allegations were intended to—and did—cause law enforcement and school officials to act to Plaintiff's detriment by filing criminal charges, issuing defamatory press releases, and terminating his employment.

119

317.    Alternatively, Thomas acted with reckless disregard for the truth or negligently made false statements without reasonable care for their accuracy, foreseeably causing the same injuries. *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 256 Va. 553 (1998).

318.    Law-enforcement and school officials reasonably relied on Thomas's misrepresentations because of her official standing and perceived credibility. The false allegations she supplied formed the factual basis for the Sheriff's Office's May 6–7, 2025 press releases and the Commonwealth's Attorney's extrajudicial media statements (Exs. E–F). Although Thomas's own statements were not published verbatim, Defendants republished her accusations in official communications that conveyed the same false implication that Plaintiff had engaged in sexual battery or predatory acts.

319.    These statements are actionable as defamation per se because they impute to Plaintiff (1) the commission of serious crimes of moral turpitude and (2) unfitness for his profession as a school employee. *Carwile v. Richmond Newspapers*, 196 Va. 1 (1954); *Tharpe v. Saunders*, 285 Va. 476 (2013).

320.    Alternatively, the statements constitute defamation by implication because any literal truth was presented in a context that conveyed a false implication of criminal or sexual misconduct. See *Pendleton v. Newsome*, 290 Va. 162 (2015).

321.    Thomas acted with actual malice and reckless disregard for the truth, motivated by animus and her alignment with law-enforcement defendants intent on silencing and discrediting Plaintiff.

322.    Thomas's false allegations were the initiating spark for a criminal case later confirmed to lack any lawful factual basis. Defense counsel Joseph Cockfield submitted four written requests on July 18, August 7, August 26, and September 15, 2025 seeking the sworn

120

probable-cause affidavits supporting the twenty-five warrants that arose directly from Thomas's report; none were produced. (Ex. H).

323.    On November 13, 2025, the Office of the Executive Secretary of the Supreme Court of Virginia confirmed in writing that none of the warrants "were accompanied by any probable-cause documentation." (Exs. Y). Because Thomas's allegations were the sole factual predicate for a criminal process built on no sworn evidence, the resulting reputational destruction, termination, and community stigma were the foreseeable and proximate consequences of her defamatory conduct.

324.    Her false and defamatory allegations were the proximate cause of Plaintiff's termination, loss of income, emotional distress, and irreparable reputational harm.

**D. Damages and Relief**

325.    As a direct and proximate result of Defendant Thomas's defamatory allegations and their republication by state officials, Plaintiff suffered severe and continuing injury to his personal and professional reputation, lost income and future earning capacity, and emotional distress. Her conduct was willful, wanton, and malicious, warranting punitive damages.

326.    WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor and against Defendant Kasey Thomas, jointly and severally with other defendants, for compensatory and punitive damages, attorneys' fees and costs, and such further relief as this Court deems just and proper.

## COUNT XVIII
## DEFAMATION PER SE AND BY IMPLICATION

(Against Defendants Matthew Ward and William Bentley, in their individual capacities)

### A. Incorporation of Allegations

327.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

### B. Factual Basis

328.    On May 6, 2025, the Botetourt County Sheriff's Office issued a public press release concerning allegations against Mr. Sherwood, authored, approved, or disseminated by Defendants Sheriff Matthew T. Ward and Sergeant William G. Bentley. A second public statement was given to media on May 7, 2025. (Exs. E–F).

329.    The May 6 press release is defamatory per se because it expressly and gratuitously associated Mr. Sherwood with accusations of sexual or indecent misconduct toward minors. The release invoked the sexual-battery statute by stating that "the nature of the reported contact did not meet the statutory criteria for sexual battery, as the reported touching did not involve intimate areas of the body." This unnecessary reference introduced sexualized connotations into the public narrative and falsely suggested that Mr. Sherwood's conduct was of a sexual nature.

330.    Under Virginia law, words that "tend to impute to a person unchastity or sexual misconduct" constitute defamation per se. *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 7 (1954). By referencing sexual-battery criteria in connection with a school-bus employee, Defendants cast Mr. Sherwood as a suspected sexual offender, imputing conduct "wholly inconsistent with the morals of a decent man." *Tronfeld v. Nationwide*, 272 Va. 709, 713 (2006).

122

331.    On May 7, 2025, Defendants or their agents made additional extrajudicial statements to WSET, stating that "parents reached out about inappropriate contact" and that the incidents were "not hugs and high fives." (Ex. F). In the context of children and a school-bus environment, the phrase "inappropriate contact" carries a clear sexual connotation and communicated that Mr. Sherwood engaged in predatory conduct toward minors. Such accusations are defamatory per se.

332.    These statements are also actionable as defamation by implication, because Defendants selectively presented information in a manner designed to convey the false impression that Mr. Sherwood engaged in sexually suggestive or criminal conduct toward minors despite knowing that no such conduct occurred. See *Pendleton v. Newsome*, 290 Va. 162 (2015).

333.    At the time of publication, Defendants knew or reasonably should have known that the twenty-five warrants lacked any sworn probable-cause affidavit or factual predicate. (Exs. V, Y). Defense counsel's repeated written requests for the affidavits in July, August, and September 2025 (Ex. H) went unanswered, and the Office of the Executive Secretary of the Supreme Court of Virginia confirmed in writing on November 13, 2025 that none of the warrants "were accompanied by any probable-cause documentation." (Ex. Y). Publishing stigmatizing accusations in the absence of any sworn factual support demonstrates knowledge of falsity or reckless disregard for the truth.

334.    For avoidance of doubt, the defamatory publications described in this Count include both the May 6, 2025 press release and the May 7, 2025 media statement, whether issued directly by Sheriff Ward, Sergeant Bentley, or by other Sheriff's Office personnel acting at their direction or with their approval. Plaintiffs expressly reserve the right to identify and add individual publishing actors once discovery reveals their identities.

123

335.    Sheriff Ward's role as a Commissioner of the Virginia Law-Enforcement Professional Standards Commission further supports actual malice, as he possessed specialized knowledge of constitutional warrant standards and knew that no lawful probable-cause basis existed to imply sexual misconduct.

336.    Defendants published these statements while acting under color of state law, but their defamatory conduct falls outside sovereign or qualified immunity because the statements were malicious, knowingly false, and undertaken in reckless disregard of Mr. Sherwood's constitutional and reputational rights.

337.    The May 6–7 statements foreseeably and directly injured Mr. Sherwood's reputation, caused loss of employment, inflicted severe emotional distress, and destroyed his standing within the community. Because the statements imputed criminal sexual misconduct involving minors, damages are presumed under Virginia law.

**D. Relief Requested**

338.    WHEREFORE, Plaintiffs respectfully request judgment against Defendants Matthew Ward and Sergeant William Bentley, jointly and severally, for compensatory damages, presumed damages, punitive damages, attorneys' fees and costs where permitted, and all further relief the Court deems just and proper.

**COUNT XIX**
**DEFAMATION PER SE AND BY IMPLICATION**

(Against Defendant John Alexander, in his individual capacity)

**A. Incorporation of Allegations**

339.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

**B. Factual Basis**

340.    On October 29, 2025—after the Juvenile & Domestic Relations Court on October 14, 2025 had dismissed twenty-three charges by *nolle prosequi* and deferred the remaining two without any finding of guilt or facts sufficient to convict—Defendant Commonwealth's Attorney John Alexander made extrajudicial statements to *The Roanoke Times* and WDBJ7 News concerning Mr. Sherwood. (Exs. FF–GG).

341.    Alexander stated that Mr. Sherwood's "touching verged on inappropriate," asserted that "there was no evidence to support charges of sexual assault," and noted that "another factor taken into account was that Sherwood is no longer working as a school bus driver." (Exs. FF–GG)

342.    Read together, these statements conveyed the false and stigmatizing implication that Mr. Sherwood engaged in sexual or morally inappropriate conduct toward minors—despite the absence of any judicial finding of guilt, despite the case remaining under deferred disposition, and despite video evidence showing no criminal or sexualized conduct. Such accusations constitute defamation per se because they impute sexual misconduct, moral turpitude, and unfitness for employment involving children. *Carwile v. Richmond Newspapers*, 196 Va. 1, 7 (1954).

343.    Alexander's statements also constitute defamation by implication because the literal words—couched in references to sexual assault—were presented in a context that falsely invited readers to infer sexual wrongdoing that did not occur. This is independently actionable under Virginia law. *Pendleton v. Newsome*, 290 Va. 162 (2015); *Webb v. Virginian-Pilot*, 287 Va. 84 (2014).

344.    Alexander made these statements outside any judicial proceeding, speaking directly to the press after he characterized the case as being "resolved," when in reality the case was still technically pending pursuant to the 12-month deferral period provided for in the plea agreement and since there was no stipulation to facts sufficient for a finding of guilt, the plea agreement in essence preserved Mr. Sherwood's presumption of innocence. Nevertheless, Alexander made these remarks in a context that was not intimately associated with the judicial phase of prosecution and are therefore outside the scope of absolute prosecutorial immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 277–78 (1993).

345.    Alexander acted with actual malice or, at minimum, reckless disregard for the truth, as he knew:

1.  The court had made no finding of guilt;

2.  Surveillance footage showed no sexual or assaultive conduct; and

3.  His statements would severely harm Mr. Sherwood's reputation, employment prospects, and community standing.

**C. Harm to Plaintiff**

346.    Alexander's defamatory statements foreseeably caused severe and continuing harm, including reputational injury, loss of employment opportunities, emotional distress,

126

humiliation, and stigma. Because the statements imputed criminal and sexual misconduct,

damages are presumed under Virginia law.

**D. Relief Requested**

347.    WHEREFORE, Plaintiffs request judgment against Defendant John Alexander, in

his individual capacity, for compensatory damages, presumed damages, punitive damages,

attorneys' fees and costs where permitted, and all other relief the Court deems just and proper.

## COUNT XX
## CIVIL RICO
## (RESERVED)

18 U.S.C. §§ 1961–1968

348.   Plaintiffs expressly reserve the right to amend this Complaint to assert additional causes of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, including but not limited to claims for racketeering activity predicated on mail fraud, wire fraud, obstruction of justice, falsification of judicial records, and conspiracy to commit such acts.

349.   This reservation is made in good faith and consistent with Fed. R. Civ. P. 11(b), based on facts reasonably expected to be revealed through discovery, including but not limited to the issuance of unsworn warrants, the documented absence of probable-cause affidavits, the alteration and supplementation of judicial records, and the coordinated dissemination of false statements by multiple state actors.

350.   Plaintiffs expressly preserve all rights to assert civil RICO claims at a later stage of this litigation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, by counsel, respectfully move this Court for judgment against Defendants, jointly and severally, and request that the Court award compensatory damages, punitive damages, front pay in lieu of reinstatement, or reinstatement if appropriate and desired, declaratory and injunctive relief (temporary, preliminary, and permanent), pre- and post-judgment interest, attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and such other and further relief as this Court deems just and proper. In support thereof, Plaintiffs pray that this Honorable Court grant the following specific relief:

**Compensatory Damages** – For the severe and irreparable harm caused by Defendants' conduct, including but not limited to reputational destruction, humiliation, emotional distress, mental anguish, lost income, diminished future earnings, and the ongoing stigma of false and defamatory statements that continue to follow Mr. Sherwood and his family.

Plaintiffs incorporate the economic-loss findings of economist Prabhat Multani, M.A., while also seeking full compensation for the far greater non-economic, reputational, constitutional, and punitive harms described herein.

**Deterrence and Public Accountability** – Plaintiffs further request that this Court and jury send a clear and unequivocal message that constitutional and statutory limits bind all government actors, law-enforcement, prosecutorial, and educational alike.

The Botetourt County Sheriff's Office, the Commonwealth's Attorney's Office, and the Botetourt County School Board each exercised state power in ways that caused or perpetuated the harms described herein. Deterrent relief is therefore necessary not only to compensate Plaintiffs, but to ensure that these governmental bodies adhere to the oaths and duties imposed on them by law.

129

Defendant Sheriff Matthew Ward, in particular, serves as a Commissioner of the Virginia Law-Enforcement Professional Standards Commission and therefore bears heightened responsibility for the constitutional compliance of his Office. His breach of that professional and constitutional duty magnified the harm inflicted on Plaintiff, undermined public trust, and warrants proportionate relief designed to prevent recurrence.

Plaintiffs further request that this Court and jury send a clear message that the law applies equally to those sworn to enforce it. Defendant Sheriff Matthew Ward, as a Commissioner of the Virginia Law-Enforcement Professional Standards Commission, bears heightened responsibility for the misconduct of his office. His breach of that duty magnifies the harm, undermines public trust, and warrants proportionate relief.

**Punitive Damages** – In an amount sufficient to punish Defendants for their willful, wanton, and reckless disregard of Plaintiffs' constitutional rights and to deter them—and every public official in the Commonwealth—from weaponizing their offices to destroy a citizen's life. The cumulative impact of these constitutional violations demands a remedy proportionate to the gravity and permanence of the injuries inflicted.

**Declaration of Constitutional Violations** – Declare that the initiation and maintenance of the Botetourt County Juvenile & Domestic Relations Court proceeding captioned *Commonwealth v. Raymond L. Sherwood III* were undertaken in violation of Plaintiffs' rights under the United States Constitution and 42 U.S.C. § 1983.

**Monetary Award** – In light of the magnitude of Defendants' misconduct, the gravity of the harm inflicted, the public interest in deterring future constitutional violations, and the enduring damage suffered by Mr. Sherwood and his family—harm that no injunction, apology, or verdict can fully erase—Plaintiffs seek damages in a total amount not less than

130

**Forty Million Dollars ($40,000,000.00)**.

**On Count XIV**, $40 million in compensatory damages, to be trebled pursuant to Va. Code § 18.2-500, together with punitive damages and attorney's fees.

**Declaratory and Injunctive Relief (Temporary, Preliminary, and Permanent)**

WPursuant to 28 U.S.C. §§ 2201–2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure, and the equitable authority recognized in *Ex parte Young*, 209 U.S. 123 (1908).

**Declaratory and Injunctive Relief (Temporary, Preliminary, and Permanent)** – Pursuant to 28 U.S.C. §§ 2201–2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure, and the equitable authority recognized in *Ex parte Young*, 209 U.S. 123 (1908).

**Permanent Injunction** – Permanently enjoin Defendants, their officers, agents, employees, and all persons acting in concert with them from continuing, enforcing, or taking any further action in that proceeding or any derivative proceeding predicated upon the same unconstitutional acts, so as to prevent further deprivation of Plaintiffs' liberty, reputation, and due-process rights.

**Temporary and Preliminary Relief** – Pending final adjudication, issue temporary and preliminary injunctions preserving the evidentiary record, prohibiting further extrajudicial statements or retaliatory conduct toward Plaintiffs or their counsel, and maintaining the status quo to prevent irreparable harm.

**Record Preservation and Correction** – Order the preservation, certification, and production of all relevant state and county records (including any "confidential" folders) under federal judicial supervision, and direct the removal or correction of any false or misleading public statements issued under color of state law that continue to cause ongoing reputational or constitutional harm, including those disseminated through official platforms or personnel files.

131

**Restoration and Reinstatement** – Grant such equitable relief as necessary to restore Plaintiffs' liberty, employment eligibility, and reputational standing, including, where appropriate, front pay in lieu of reinstatement, or reinstatement if appropriate and desired, pending the outcome of these proceedings.

**Declaratory Relief** – Declare that Plaintiffs are entitled to relief under 42 U.S.C. § 1983 for ongoing deprivation of federal constitutional rights and that any further state-court or administrative action based on the defective proceedings would constitute a continuing constitutional injury.

**Costs and Fees** – Award Plaintiffs their costs, reasonable attorneys' fees, and pre- and post-judgment interest under 42 U.S.C. § 1988.

**Other Just and Proper Relief** – Grant such additional relief—legal or equitable—as this Court deems just and proper in the interests of justice.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

**THE SHERWOOD FAMILY**,
Plaintiffs
By Counsel
/s/ Jon C. Clark

Jon C. Clark (VSB No. 95232)
JON CLARK LAW, PLLC
6711 Williamson Road, Suite D
Roanoke, Virginia 24019
Phone: (540) 613-1300
Facsimile: (540) 613-5502
Email: jclark@jonclarklaw.com
*Counsel for Plaintiffs*

132